2002-NMSC-012

46 P.3d 668

Lisa GALLEGOS, Plaintiff–Appellant,

v.

PUEBLO OF TESUQUE d/b/a Camel Rock Gaming Center, Zurich American Insurance Company, National Sanitary Supply Company, Inc., Rubbermaid, Inc., and Does 1–20, inclusive, Defendants–Appellees.

No. 26,149.

Supreme Court of New Mexico.

April 26, 2002.

**210**

Eric Treisman, Monte D. Richard, Santa Fe, NM, for Appellant.

Butt, Thornton & Baehr, P.C., Emily A. Franke, James H. Johansen, Guebert & Yeomans, P.C., Terry R. Guebert, Alysan Boothe Collins, Stetson Law Offices, P.C., Catherine Baker Stetson, Jana L. Walker, Albuquerque, NM, for Appellees.

Williams, Janov & Cooney, P.C., Gwenellen P. Janov, Albuquerque, Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg, & Enfield, L.L.P., Richard W. Hughes, Santa Fe, NM, Nordhaus, Haltom, Taylor, Taradash & Frye, Lester K. Taylor, Ussery & Parrish, P.A., David C. Mielke, Hilary C. Tompkins, Albuquerque, NM, for Amici Curiae, Pueblos of Santa Ana, San Felipe, Sandia, Isleta and Laguna.

Carpenter & Chavez, Ltd., William H. Carpenter, Vanzi & Gagne, P.C., Linda M. Vanzi, Pasternack & Blake, P.C., Valerie A. Chang, Albuquerque, NM, for Amicus Curiae, New Mexico Trial Lawyers Association.

## OPINION

BACA, Justice.

{1} In this case, certified from the Court of Appeals pursuant to NMSA 1978, § 34–5–14(C)(2) (1972), we confront two issues presented in two cases consolidated by the Court of Appeals prior to certification. First, we are asked whether federal or state law, or the terms of the 1995 or 1997 Compacts, provide the state court with subject matter jurisdiction over an action in tort brought by a non-Indian against an Indian tribe, when the non-Indian was allegedly injured at the tribe's gaming facility and no gaming compact was legally in effect. Second, we are asked to decide whether the Pueblo of Tesuque ("Tesuque") is an indispensable party pursuant to Rule 1–019–NMRA–2002 in an action against Zurich American Insurance Company ("Zurich"), Tesuque's insurance carrier, for breach of contract for failure to pay medical payments, breach of contract for raising a sovereign immunity defense, insurance bad faith, and unfair practices under the New Mexico Trade Practices and Fraud Act, NMSA 1978, § 59A–16–1 to–30 (1984, as amended through 2001). Given the unique circumstances of this case, we confine the application of our analysis to these facts. We hold that (1) the dismissal of Lisa Gallegos' ("Gallegos") complaint was proper as Tesuque had not expressly and unequivocally waived its immunity from suit or consented to state court jurisdiction through a compact or other form, and (2) Tesuque is an indispensable party in this suit against its insurance carrier.

{2} Therefore, we affirm the district court's order granting the motion to dismiss the complaint against Tesuque for lack of subject matter jurisdiction and affirm the district court's order granting the motion to dismiss the complaint against Zurich for failure to join an indispensable party.

## I.

{3} On October 28, 1996, Gallegos was a visitor at the Camel Rock Gaming Center ("Casino") located on the Pueblo of Tesuque Indian reservation. As Gallegos was entering the walkway from the parking lot, a sudden gust of wind blew a garbage container into her, knocking her down. As a result of this incident, Gallegos allegedly suffered severe contusions and injuries, including a displaced fracture of her right elbow. At the time of the incident, Tesuque, which owned and operated the Casino, had an insurance policy in effect with Zurich. As a result of her injuries, Gallegos asserts that she incurred substantial medical expenses. She reported over $20,000 in such expenses to Zurich, which paid a small portion and then discontinued payment.

{4} On December 11, 1997, Gallegos filed a lawsuit in a New Mexico district court against Tesuque and other defendants to recover for the personal injuries she allegedly sustained as a result of the October 28, 1996 incident. Defendants filed a motion to dismiss asserting that Gallegos' lawsuit fell within the exclusive jurisdiction of the tribal court and that the state court lacked jurisdiction over it as Tesuque is immune from suit in state court. On August 3, 1998, the district court granted the motion and dismissed the complaint as to Tesuque, orally finding that the district court lacked jurisdiction to hear the action because no compact covered the date of the incident and Tesuque had not waived its sovereign immunity. The court dismissed the complaint as to the other defendants without prejudice to Gallegos' right to file an amended complaint. Gallegos appealed the district court's order as to Tesuque to the Court of Appeals.

{5} On October 26, 1998, Gallegos filed a separate lawsuit against Zurich and several other defendants. She alleged breach of contract for failure to pay medical payments, breach of contract for raising a sovereign immunity defense, insurance bad faith, and unfair practices under the New Mexico Trade Practices and Fraud Act against Zurich. After filing an answer, Zurich filed a motion to dismiss for failure to join an indispensable party pursuant to Rule 1–019. Zurich claimed that Gallegos was seeking to recover damages for Tesuque's alleged liability, and, thus, Tesuque was an indispensable party. Zurich argued that, since sovereign immunity precluded joinder of Tesuque in an action in state court, the action against Zurich must be dismissed. The district court dismissed Zurich from the lawsuit. Gallegos appealed to the Court of Appeals. The Court of Appeals recognized that any ruling in this case "involve[d] a significant issue of intersovereign law and substantial public interest concerning personal injuries suffered by patrons of our State's tribal-run casinos *after* the invalidation of the original 1995 Gaming Compacts, ... *but prior to* the effective date of the Compacts enacted in 1997," and, thus, sought certification to this Court.

## II.

{6} We first address the issue of whether the district court had subject matter jurisdiction over the claim brought by Gallegos against Tesuque. In reviewing an appeal from an order granting or denying a motion to dismiss for lack of jurisdiction, the determination of whether jurisdiction exists is a question of law which an appellate court reviews de novo. *See Barnae v. Barnae*, 1997–NMCA–077, ¶¶ 10–11, 123 N.M. 583, 943 P.2d 1036; *see also Sac and Fox Nation v. Hanson*, 47 F.3d 1061, 1063 (10th Cir.1995) (concluding that the validity of an assertion of sovereign immunity is a question of law which requires de novo review).

{7} Tesuque argues that it is immune from suit in state court and that the district court properly dismissed the action brought by Gallegos on the basis of lack of subject matter jurisdiction and tribal sovereign immunity. We agree. "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian Tribe of Okla.*, 498 U.S. 505, 509, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991) (quoting *Cherokee Nation v. Georgia*, 30 U.S. 1, 17, 5 Pet. 1, 8 L.Ed. 25 (1831)). Indeed, "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *accord Hanson*, 47 F.3d at 1063. Although Indian tribes enjoy sovereign authority over their members and territories, their immunity from suit in state court is not absolute. *Santa Clara Pueblo*, 436 U.S. at 58, 98 S.Ct. 1670. Article I, Section 8 of the U.S. Constitution provides Congress with the ultimate authority over Indian affairs, and, thus, Congress can expressly authorize suits against Indian tribes through legislation. *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 890–91, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986); *see Santa Clara Pueblo*, 436 U.S. at 58, 98 S.Ct. 1670. A tribe can also waive its own immunity by unequivocally expressing such a waiver. *See Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751,

754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998); *Santa Clara Pueblo,* 436 U.S. at 58, 98 S.Ct. 1670; *Hanson,* 47 F.3d at 1063; *cf. Mescalero Apache Tribe v. New Mexico,* 131 F.3d 1379, 1385–86 (10th Cir.1997). Thus, tribal immunity is a matter of federal law and is not subject to diminution by the states. *See Three Affiliated Tribes,* 476 U.S. at 891, 106 S.Ct. 2305. Without an unequivocal and express waiver of sovereign immunity or congressional authorization, state courts lack the power to entertain lawsuits against tribal entities. *See Puyallup Tribe, Inc. v. Dep't of Game,* 433 U.S. 165, 172, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977) ("Absent an effective waiver or consent, it is settled that a state court may not exercise jurisdiction over a recognized Indian tribe.")

{8} Gallegos was allegedly injured on Tesuque's reservation while she was patronizing Tesuque's gaming facility. As gaming on tribal lands is governed by the federal Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–2721 (1994 & Supp. V 1999), we must determine what, if any, effect the provisions of the IGRA have on this case and Gallegos' claims.

### A.

{9} Before the passage of the IGRA, Congress found that "numerous Indian tribes [had] become engaged in or [had] licensed gaming activities on Indian lands as a means of generating tribal government revenue." 25 U.S.C. § 2701(1) (1994). Existing federal law, however, did not "provide clear standards or regulations for the conduct of gaming on Indian lands." 25 U.S.C. § 2701(3) (1994). Accordingly, in 1988, Congress passed the IGRA which provided "a 'comprehensive

regulatory framework for gaming activities on Indian lands' which '[sought] to balance the interests of tribal governments, the states, and the federal government.'" *Pueblo of Santa Ana v. Kelly,* 104 F.3d 1546, 1548 (10th Cir.1997) ("*Kelly II* ") (quoting *Ponca Tribe of Okla. v. Oklahoma,* 37 F.3d 1422, 1425 (10th Cir.1994) *vacated,* 517 U.S. 1129, 116 S.Ct. 1410, 134 L.Ed.2d 537 (1996)). Most importantly, the IGRA established the framework under which Indian tribes and states could negotiate compacts permitting Class III gaming [1] on Indian reservations located within state territory. *See* 25 U.S.C. § 2702 (1994); *Srader v. Verant,* 1998–NMSC–025, ¶ 8, 125 N.M. 521, 964 P.2d 82. Class III gaming would be lawful on Indian lands only if such activities were "conducted in conformance with a Tribal–State compact entered into by the Indian tribe and the State . . . [and that Compact was] in effect." [2] 25 U.S.C. § 2710(d)(1)(C) (1994).

{10} In the IGRA, "Congress attempted to strike a balance between the rights of tribes as sovereigns and the interests that states may have in regulating sophisticated forms of gambling." *State ex rel. Clark v. Johnson,* 120 N.M. 562, 566, 904 P.2d 11, 15 (1995). As previously stated, the state's role with respect to jurisdiction over tribal matters is limited. *See Srader,*1998–NMSC–025, ¶¶ 9–10, 125 N.M. 521, 964 P.2d 82; *Found. Reserve Ins. Co. v. Garcia,* 105 N.M. 514, 516, 734 P.2d 754, 756 (1987). However, the language of the IGRA allows the states and the tribes to negotiate with respect to jurisdiction. *See* 25 U.S.C. § 2710(d)(3)(C)(ii) (1994) ("Any Tribal–State compact . . . may include provisions relating to the allocation of criminal and civil jurisdiction between the State and the Indian

1. The Act divides gaming into three categories. Class I gaming is comprised of "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations." 25 U.S.C. § 2703(6) (1994). Class II gaming consists primarily of bingo but includes "pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo," as long as those games are played at the same location as bingo. 25 U.S.C. § 2703(7)(A)(i) (1994). Last, Class III gaming is high-stakes, casino-style gaming, which includes " 'slot machines, casino games,

banking card games, dog racing, and lotteries.'" *Kelly II,* 104 F.3d at 1549 (quoting *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 48, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)); *see also* 25 U.S.C. § 2703(8) (1994). Under the IGRA, Class I and Class II gaming continue to be within the exclusive jurisdiction of the Indian tribes. *See* 25 U.S.C. § 2710(a) (1994).

2. The compact goes into "effect" when it is approved by the Secretary of the Interior and the notice is published in the Federal Register. *See* 25 U.S.C. § 2710(d)(3)(B) (1994).

tribe. . . ."). Thus, according to Congress, a state court may exercise jurisdiction over a tribe pursuant to the IGRA when a tribe and a state have consented to such an arrangement in a gaming compact.[3] *See, e.g., Gaming Corp. of Am. v. Dorsey & Whitney,* 88 F.3d 536, 545–46 (8th Cir.1996).

{11} Gallegos claims that Tesuque waived its sovereign immunity and consented to be sued in a New Mexico court under either the 1995 or 1997 Compact. This case poses a unique issue because, at the time Gallegos sustained her claimed injuries on October 28, 1996, neither the 1995 nor the 1997 Compact was in effect. Nevertheless, Gallegos asserts that by entering into these compacts and conforming to their mandates, Tesuque waived its tribal immunity, thereby giving subject matter jurisdiction over this case to a New Mexico court. We review Gallegos' arguments under both the 1995 and 1997 Compacts, respectively.

### B.

{12} In 1995, the Tribes and the Governor of New Mexico negotiated to enter into tribal-state compacts permitting Class III gaming. *See Clark,* 120 N.M. at 567, 904 P.2d at 16. In February 1995, Tesuque signed a gaming compact that the Secretary of the Interior approved and then published in the Federal Register on March 22, 1995. *See Pueblo of Santa Ana v. Kelly,* 932 F.Supp. 1284, 1290 (D.N.M.1996) ("*Kelly I* "), *aff'd,* 104 F.3d 1546 (10th Cir.1997). Section 8 of that compact stated that, to insure the personal safety and protection of patrons and other invitees of Tesuque's gaming facilities, Tesuque would maintain an insurance policy of no less than one million dollars for personal injury coverage. Also, Tesuque agreed that in the event of any personal injury claim by its patrons or invitees, against it or its gaming enterprise, neither it nor its insurer would assert any defense of immunity from suit in any action for compensatory damages up to one million dollars to be tried to the court filed in a "court of competent jurisdic-

tion." Gallegos argues that under this compact, Tesuque waived its sovereign immunity and consented to be sued in state court.

{13} The validity of the 1995 Compacts, including the Tesuque Compact, was challenged in *Clark* on the ground that "the Governor of New Mexico lacked the authority to commit New Mexico to these compacts and agreements, because he attempted to exercise legislative authority contrary to the doctrine of separation of powers expressed in the state Constitution." 120 N.M. at 566, 904 P.2d at 15. This Court agreed with the petitioner in *Clark* and held that the Governor lacked the authority under Article III,. Section I of the state constitution to bind the state by unilaterally entering into the compacts. *See id.* at 578, 904 P.2d at 27. This Court issued a peremptory writ and stayed all actions to enforce, implement, or enable any and all of the gaming compacts and revenue sharing agreements. *See id.*

{14} Although the 1995 Compacts were described as without legal effect by this Court prior to Gallegos' alleged injury on October 28, 1996, Gallegos maintains that Tesuque's waiver of immunity in the 1995 Compact survived. She makes two arguments to support this contention. First, Gallegos asserts that the 1995 Compact remained in effect pursuant to a federal court's stay of its judgment pending appeal in a collateral case. Second, she argues that Tesuque should be estopped from asserting that the 1995 Compact was not in effect on October 28, 1996, since Tesuque continued gaming activities, continued hosting patrons, and maintained an insurance policy in conformity with the compact. We do not agree with Gallegos' arguments and hold that the 1995 Compact was not in effect in any manner at the time that Gallegos allegedly sustained her injuries. Therefore, any waiver of immunity or jurisdiction-shifting provision within the compact would not cover this claim.

### i.

{15} Gallegos first asserts that the Tesuque Compact and its provisions were in

---

**3.** Both Tesuque and Amici for Tesuque argue that the jurisdiction-shifting provisions themselves of the compacts are invalid and therefore do not confer jurisdiction on the state court. As

we conclude that neither compact is applicable to Gallegos, we need not address these arguments.

effect at the time of her injury pursuant to a stay entered by the federal district court in a collateral case decided subsequent to this Court's decision in *Clark*. To fully understand Gallegos' argument in this regard, we must briefly review and analyze the history of Indian gaming in New Mexico and the procedural posture of *Kelly I* and *Kelly II*. Although the IGRA required a tribal-state compact in order for tribes to lawfully conduct Class III gaming, Tesuque began to conduct some form of Class III gaming on its reservation absent a compact in 1992. *See Kelly II*, 104 F.3d at 1549; *Kelly I*, 932 F.Supp. at 1290. In May 1994, Tesuque, along with other pueblos that were engaging in Class III gaming without a compact, "entered into [a] non-prosecution agreement[ ] with the United States Attorney, whereby the Tribes agreed not to expand their gaming activities beyond specified levels in exchange for the United States Attorney's agreement not to take any enforcement action against them for failing to comply with the provisions of the IGRA." *Kelly I*, 932 F.Supp. at 1290. After the 1995 Compacts had been entered into, the United States Attorney advised the Tribes that he was terminating the non-prosecution agreements. *See Kelly II*, 104 F.3d at 1550; *Kelly I*, 932 F.Supp. at 1290. He indicated that "the execution, approval and publication of [the] Tribes' compacts [with New Mexico] should bring them into compliance with applicable federal law." *Kelly I*, 932 F.Supp. at 1290.

{16} After *Clark*, the Tribes continued to participate in Class III gaming. *See Kelly I*, 932 F.Supp. at 1290–91. "The United States Attorney warned the Tribes that their gaming activities must cease or casino employees and patrons [would] be subject to federal criminal sanctions and the alleged illegal gaming devices [would] be subject to forfeiture." *Id.* at 1291. Consequently, the Tribes filed an action in the U.S. District Court seeking a declaratory judgment, arguing among other things that the compacts with New Mexico were valid as the Secretary of the Interior had subsequently approved the compacts and published them in the Federal Register. *See id.* The Tribes argued that the Secretary's approval was conclusive as to the validity of the compacts, despite the Governor's lack of authority to enter into such agreements. *See id.* In January 1996, while the case was pending in federal district court, the Tribes and the United States Attorney entered into a court-approved Stipulation. In the Stipulation, the Tribes agreed to voluntarily comply with the decision of the federal district court to cease all Class III gaming upon a final judgment that the casinos were in violation of federal law, unless a stay pending appeal was granted. Additionally, the Tribes agreed to refrain from taking any and all action to close public highways and thoroughfares crossing Indian land in New Mexico. In return, the United States Attorney agreed to refrain from filing a forfeiture proceeding or otherwise taking civil or criminal enforcement action against the Tribes as long as the terms and conditions of the Stipulation were observed.

{17} On July 12, 1996, the federal district court also declared the 1995 Compacts void. *Kelly I*, 932 F.Supp. at 1299. The district court determined that "[t]he validity of the Plaintiff Tribes' gaming compacts presents a federal question to be decided by this Court." *Id.* at 1293. The court also decided that "a valid compact is a prerequisite to the Secretarial approval necessary to put the compact 'in effect.'" *Id.* at 1292. The court described the IGRA as requiring "the existence of a valid Tribal–State compact independent of the requirement that the compact be in effect by virtue of the Secretary's approval." *Id.* Finally, the court concluded that "Congress intended that state law determine the procedure for executing valid gaming compacts." *Id.* at 1294. The court reexamined New Mexico law independent of this Court's decision in *Clark* and determined that the Governor's actions "encroached upon the Legislature's authority, contrary to the constitutional separation of powers doctrine." *Id.* at 1294–95. The district court, therefore, agreed that the Tribes' compacts were invalid and concluded that the Tribes had failed to satisfy the requirements necessary for them to conduct Class III gaming. *See id.* at 1299.

{18} The Tribes, including Tesuque, promptly filed a Notice of Appeal, seeking review of the district court's decision, and a motion requesting a stay of the judgment

pending appeal in the Tenth Circuit Court of Appeals. The district court granted the stay pending appeal pursuant to Fed.R.Civ.P. 62(c). The district court recognized that Rule 62(c) applies solely to injunctions and does not generally apply to declaratory judgments but concluded that a declaratory judgment combined with the court-approved Stipulation in this case had the practical effect of granting injunctive relief. *See Samuels v. Mackell*, 401 U.S. 66, 72–73, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971) (concluding that the practical effect of declaratory and injunctive relief is virtually identical). Thus, the district court granted the Tribes' motion for a stay, or injunction pending appeal, thereby permitting the Tribes' casinos and other gaming facilities to remain open pending appeal, even though no compact was in effect. *See Kelly II*, 104 F.3d at 1548. On appeal, the Tenth Circuit affirmed the district court's ruling invalidating the compacts. *See id.* at 1553. The Tenth Circuit did not decide whether it needed to re-examine state law or defer to this Court's decision in *Clark* but rather decided that in either event it would conclude that the Governor lacked authority to bind the State absent legislative authorization. The compacts were therefore never validly "entered" by the State and, as a result did not comply with the IGRA. *Id.* at 1558. The stay remained in effect until the U.S. Supreme Court denied certiorari on October 6, 1997. *See id.* at 1559; *Pueblo of Santa Ana v. Kelly*, 522 U.S. 807, 118 S.Ct. 45, 139 L.Ed.2d 11 (1997).

{19} The stay was in effect on October 28, 1996 when Gallegos allegedly sustained her injuries. We do not agree that the federal district court's stay revived the 1995 Compact and, consequently, its waiver and jurisdictional provisions. The Stipulation of the parties defined the scope of the stay, as it was the combination of the Stipulation and the declaratory judgment that permitted the granting of the stay. *See Shay v. Agric. Stabilization & Conserv. State Comm. for Ariz.*, 299 F.2d 516, 525 (9th Cir.1962) (concluding that Rule 62(c) applies to injunctions); *Yankton Sioux Tribe v. Southern Mo. Waste Mgmt. Dist.*, 926 F.Supp. 888, 890 (D.S.D.1996) (concluding that Rule 62(c) does not apply to declaratory judgment actions). The Stipulation, which was not signed by the State of New Mexico, was not an agreement to revive or validate the 1995 Compacts. Rather it was an agreement to allow the Tribes to continue their gaming activities without a compact in place during the resolution of the federal appeals process, without the threat of civil or criminal prosecution by the federal government.

{20} We conclude that the federal courts addressed issues related but collateral to our decision in *Clark*. In *Kelly I* and *Kelly II*, the federal courts addressed the United States Attorney's threat to prosecute for illegal gaming under the IGRA and, as their opinions make clear, the specific question of the role of state law under the IGRA in determining the validity of a gaming compact. In addressing that question, the federal appellate court concluded that "[s]tate law must determine whether a state has validly bound itself to a compact." *Kelly II*, 104 F.3d at 1557. That court also agreed with this Court that as a matter of state law the governor lacked power to "enter into" a valid compact without legislative authorization. *Id.* at 1559. The court summarized its holding as a determination that the Secretary of the Interior could not, under the IGRA, "vivify that which was never alive." *Id.* at 1548.

{21} We agree with the federal courts that as a result of *Clark* and *Kelly I* and *II*, the compacts have been held void from their inception. In view of these holdings, we also conclude that there never was a valid waiver of immunity nor an agreement to transfer jurisdiction to state court.[4]

---

4.  Gallegos also argues that because the compacts were declared invalid not for any substantive failings, but rather because the Governor lacked power under New Mexico law to ratify the agreements without approval from the Legislature, we should hold that the immunity waiver provisions of the 1995 Compact were in effect at the time of her alleged injury. However, Gallegos cites no

authority to support her argument. The 1995 Compact has been determined to have been without legal effect from its inception or void, and the reasons for that determination do not provide a basis for distinguishing among its various provisions. Gallegos' argument seems to us a different way of contending that Tesuque has waived its immunity, a contention that we have an-

**ii.**

{22} Alternatively, Gallegos contends that Tesuque should be estopped from asserting its sovereign immunity and the state court's lack of jurisdiction and held to the provisions of the 1995 Compact, because it continued to do business under the federal stay without a compact in place. Although Gallegos fails to address in her brief-in-chief what type of estoppel she wants this Court to apply, the basis of her argument is that, under the federal stay, "by accepting and retaining the benefits of illegal gaming activity, [Tesuque] thereby waived and is estopped from asserting [sovereign immunity]." We are not persuaded by this argument.

{23} There are two types of estoppel potentially applicable in this case: judicial and equitable. Judicial estoppel prohibits a party from maintaining inconsistent positions in legal proceedings. Thus, "[w]here a party assumes a certain position in a legal proceeding and succeeds in maintaining that position, he may not thereafter assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *Citizens Bank v. C & H Constr. & Paving Co., Inc.*, 89 N.M. 360, 366, 552 P.2d 796, 802 (Ct.App.1976); *see, e.g., State v. St. Cloud*, 465 N.W.2d 177, 178–80 (S.D.1991) (judicially estopping a defendant from claiming he was an Indian in state court after he had successfully asserted that he was not an Indian in federal court for purposes of the Major Crimes Act). A party cannot play " 'fast and loose' " with the court by changing legal positions in the midst of a suit. *Citizens Bank*, 89 N.M. at 366, 552 P.2d at 802

(quoting *Chapman v. Locke*, 63 N.M. 175, 179, 315 P.2d 521, 524 (1957)). Arguably, Tesuque's present position that the 1995 Compact is invalid conflicts with its position in *Kelly I* and *Kelly II* that the 1995 Compact was valid and in effect. Nonetheless, judicial estoppel is inapplicable. Judicial estoppel cannot be used against a party which espoused a position in an earlier case and lost and is now correctly stating the law that came from that decision.

{24} Equitable estoppel is equally inapplicable in this case. Equitable estoppel "precludes a litigant from asserting a claim or defense that might otherwise be available to him against another party who has detrimentally altered his [or her] position in reliance on the former's misrepresentation or failure to disclose some material fact." *Fed. Deposit Ins. Corp. v. Harrison*, 735 F.2d 408, 410 (11th Cir.1984). In general, though, courts are reluctant to apply equitable estoppel to a government entity. *Id.* at 410.[5] Indeed, the principle that the state is rarely equitably estopped "has often been regarded as a corollary of the principle of sovereign immunity" in New Mexico. *Taxation & Revenue Dep't v. Bien Mur Indian Market Ctr., Inc.*, 108 N.M. 228, 230–31, 770 P.2d 873, 875–76 (1989).

{25} Gallegos requests that this Court estop Tesuque from asserting sovereign immunity and lack of state court jurisdiction based on Tesuque's continued operation of the casino under the federal stay. However, Gallegos fails to enumerate any overt representations made by Tesuque, beyond its mere operation of business pursuant to the federal stay. Gallegos sets forth no

---

swered in the preceding section, or that it should be estopped in asserting its immunity, a contention that we address in the following section.

**5.** For example, a party asserting equitable estoppel against the federal government must demonstrate that: "(1) the government knew the facts; (2) the government intended its conduct to be acted upon or so acted that plaintiffs had the right to believe it was so intended; (3) plaintiffs must have been ignorant of the true facts; and (4) plaintiffs reasonably relied on the government's conduct to their injury." *Kelly I*, 932 F.Supp. at 1298. In addition to these four factors, the claimant must demonstrate "affirmative misconduct on the part of the government." *Id.*

at 1299. ("Affirmative misconduct means an affirmative act of misrepresentation or concealment of a material fact. Mere negligence, delay, [or] inaction … does not constitute affirmative misconduct." (internal quotation marks and quoted authority omitted)). Courts are equally hesitant to apply estoppel against a state governmental entity unless "there is a shocking degree of aggravated and overreaching conduct or … right and justice demand it." *Memorial Medical Ctr., Inc. v. Tatsch Constr., Inc.*, 2000–NMSC–030, ¶ 10, 129 N.M. 677, 12 P.3d 431 (quoting *Wisznia v. Human Servs. Dep't*, 1998–NMSC–011, ¶ 17, 125 N.M. 140, 958 P.2d 98).

allegations that she detrimentally relied on the 1995 Compact's validity either in her decision to gamble at the Casino or to file her personal injury suit against Tesuque. *See, e.g., Padilla v. Pueblo of Acoma,* 107 N.M. 174, 179, 754 P.2d 845, 850 (1988) (concluding that nothing in the record suggested that the pueblo had concealed any facts or made "any representation upon which [the plaintiff] reasonably could rely that [the pueblo's commercial enterprise] either waived its immunity or was acting in a capacity separate and distinct from the tribe"), *implicitly overruled on other grounds by Kiowa Tribe,* 523 U.S. at 760, 118 S.Ct. 1700; *United States ex rel. Crow Creek Sioux Tribe v. Hattum Family Farms,* 102 F.Supp.2d 1154, 1164–65 (D.S.D.2000) (concluding that the tribe, as qui tam plaintiff on behalf of the government, was not estopped from asserting contract invalidity where the defendant could not show affirmative misconduct by the tribe or that he had relied on any representation by the tribe in "good faith to his detriment" (internal quotation marks and citation omitted)); *cf. Harrison,* 735 F.2d at 413 (finding equitable estoppel applicable to the government when agent assured loan guarantors that their guaranty agreements would not be enforced and the guarantors "detrimentally relied on the representations of FDIC agents concerning the extent of their guaranty liability and the repayment status of their principle [sic] debtor" (footnote omitted)). In fact, Gallegos conceded at the hearing on the motion to dismiss that she waited until the 1997 Compact became effective to file her suit, which indicates that she did not rely on the 1995 Compact in making the decision to exercise her legal rights. Nor does Gallegos allege that Tesuque misinformed her or the public regarding its status. The result of *Clark* and *Kelly I,* that the 1995 Compact was without legal effect as a matter of state law and void as a matter of federal law, was public record in this state.

{26} Gallegos does assert in her reply brief on appeal that she relied, generally, on the insurance to protect her and "in that reliance she relied on each and every representation the Pueblo made in order that such insurance be there." Gallegos does not argue that the purchase of the insurance policy itself operated as a waiver of sovereign immunity; nor does she argue that the maintenance of insurance operated as a misrepresentation by Tesuque. *See Atkinson v. Haldane,* 569 P.2d 151, 167–70 (Alaska 1977) (recognizing that maintenance of insurance policy would not support conclusion that tribe had waived its immunity as tribe purchased insurance policy to protect tribal resources). Rather Gallegos contends that the policy includes a provision waiving Tesuque's sovereign immunity, and, thus, Tesuque should be precluded from raising this defense through its insurance company. While it is true that Tesuque maintained a liability insurance policy at the time of the incident, this Court could not locate any provision in the policy produced in the appellate record indicating that Zurich would not assert sovereign immunity as a defense on behalf of Tesuque. Nor have the parties directed us to such a provision.

{27} Gallegos urges us to look to Tesuque's gaming activities solely as a commercial venture in our review of her arguments. Some courts have examined the type of activity engaged in by the government as an element in their analysis and permitted equitable estoppel when the activity was proprietary or commercial. *See Harrison,* 735 F.2d at 410–12. We are persuaded, however, that the determination of whether Tesuque's gaming operation is a commercial or governmental enterprise is unnecessary to our analysis for two reasons. First, the U.S. Supreme Court recently held in *Kiowa Tribe,* 523 U.S. at 760, 118 S.Ct. 1700 that Indian tribes have "immunity from suits on contracts, whether those contracts involve governmental or commercial activities and whether they were made on or off a reservation." Thus, at least in the context of a contract dispute, whether a tribe's activity was a commercial or a governmental function appears to be a distinction without a difference. *See id.; Hanson,* 47 F.3d at 1065 (concluding that "[w]ithout an explicit waiver, the [tribe] is immune from suit in state court—even if the suit results from commercial activity occurring off the [tribe's] reservation."); *see also DeFeo v. Ski Apache Resort,* 120 N.M. 640, 643, 904 P.2d 1065, 1068 (Ct.

App.1995) (holding that tribe did not waive sovereign immunity through on-reservation commercial activity, which precluded state court from hearing a personal injury case). Second, the Court in *Kiowa Tribe* reiterated that it was for Congress, not the judiciary, to set the boundaries of tribal immunity, stating "[a]s a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." 523 U.S. at 754, 118 S.Ct. 1700. As we recognize that waivers of tribal immunity must be unequivocal and express, *Santa Clara Pueblo*, 436 U.S. at 58, 98 S.Ct. 1670 it is therefore imperative that the party asserting equitable estoppel against a tribe allege at a minimum the requisite elements of that claim. Our review of the record reveals that Gallegos has made no such showing.

{28} We are not persuaded that the sole fact that Tesuque was operating a casino is reason enough to set aside the basic canons of tribal sovereignty and estop Tesuque from asserting its immunity. To apply equitable estoppel in this case against a tribe is to, in effect, imply a waiver of its sovereign immunity. *See Padilla*, 107 N.M. at 179, 754 P.2d at 850 ("[G]iven the requirement that waiver of tribal immunity be express and unequivocal, ... it would be difficult at best to support a claim that a tribe could, through other than express and unequivocal conduct, be equitably estopped to assert its immunity."). It is clear that Tesuque operated its gaming facility pursuant to the federal stay but without a compact in place conferring jurisdiction on the state court. However, we conclude that Gallegos has not alleged any conduct on the part of Tesuque that this Court can deem to be of such a nature as to require the extraordinary remedy of equitable estoppel against Tesuque and imply a waiver of its sovereign immunity from suit.

## C.

{29} In the alternative, Gallegos argues that the 1997 Compact operates retroactively such that it covers her claim and allows her to bring suit against Tesuque in state court. Gallegos contends that, even though she sustained her injury prior to the effective date of the 1997 Compact and filed suit after it became effective, she still enjoys the benefit of the Compact's Section 8 jurisdiction-shifting provision and waiver of sovereign immunity, as she is "in the class of intended beneficiaries" of the compact and the contract entered by Tesuque. She argues that "[S]ection 8 provides gaming patrons important rights and remedies that cannot be whisked away without offending the Compact, ... [and the IGRA]."[6] Although Gallegos concentrates her assertions on the validity of the jurisdiction-shifting provision contained in Section 8, the issue here is whether Gallegos' claims fall within the scope of the 1997 Compact. Gallegos cites no authority for the proposition that compacts of this nature operate retroactively to encompass claims that arise before their effective date, nor does she cite authority that under either traditional contract or statutory canons of construction a compact can be applied retroactively. We are not persuaded.

{30} The 1997 Compact is a contract between the State of New Mexico and Tesuque, codified by the Legislature. *See* § 11–13–1; *Texas v. New Mexico*, 482 U.S. 124, 128, 107 S.Ct. 2279, 96 L.Ed.2d 105 (1987) (defining a compact as a contract which when approved by Congress has the force of federal law); *Kelly II*, 104 F.3d at 1556 ("A compact is a form of contract."); *Confederated Tribes of the Chehalis Reservation v. Johnson*, 135 Wash.2d 734, 958 P.2d 260, 267 (Wash.1998) ("Tribal-state gaming compacts are agreements, not legislation, and are interpreted as contracts."). Generally, the goal of contract interpretation is to " 'ascertain the intentions of the contracting parties.' " *Ponder v. State Farm Mut. Auto. Ins. Co.*, 2000–NMSC–033, ¶ 11, 129 N.M. 698, 12 P.3d 960 (quoting *Strata Prod. Co. v. Mercury Exploration Co.*, 1996–NMSC–016, 121 N.M. 622, 630, 916 P.2d 822, 830). " '[T]he court's duty is confined to interpret-

6. "Section 8" is a reference to a portion of the Indian Gaming Compact enacted in 1997. It provides for a waiver of tribal sovereign immunity and that "the general civil laws of New Mexico and concurrent civil jurisdiction in the State courts and the Tribal courts shall apply to a visitor's claim of liability for bodily injury." NMSA 1978, § 11–13–1(8)(A), (D) (1997).

ing the contract that the parties made for themselves, and absent any ambiguity, the court may not alter or fabricate a new agreement for the parties." *Id.* (quoting *CC Housing Corp. v. Ryder Truck Rental, Inc.,* 106 N.M. 577, 579, 746 P.2d 1109, 1111 (1987)).

{31} The express language of the 1997 Compact is unambiguous. *See Vickers v. N. Am. Land Devs., Inc.,* 94 N.M. 65, 68, 607 P.2d 603, 606 (1980) (noting that a contract is ambiguous only "if it is reasonably and fairly susceptible of different constructions"). Section 9 provides:

> This Compact shall be effective immediately upon the occurrence of the last of the following:
>
> A.  execution by the Tribe's Governor after approval of the Tribal Council;
>
> B.  execution by the Governor of the State;
>
> C.  approval by the Secretary of the Interior; and
>
> D.  publication in the Federal Register.

Section 11–13–1(9). Additionally, Section 11 provides that the "Compact shall be binding upon the State and Tribe for a term of nine (9) years *from the date it becomes effective.*" Section 11–13–1(11) (emphasis added). According to its own terms, the 1997 Compact became effective on August 29, 1997 upon publication of notice in the Federal Register, *see* 62 Fed.Reg. 45,867 (Aug. 29, 1997), and, on that date, its provisions became "binding upon the State and Tribe." Section 11–13–1(11). Thus, according to the express terms of the compact, it was not in effect in October 1996 when Gallegos' claim arose.

{32} Moreover, the compact is silent as to any retroactive application. We will not imply from this silence such a provision as it is not evident that retroactive application was within the contemplation of the State and Tribe upon making this agreement. *See Ponder,* 2000–NMSC–033, ¶ 11, 129 N.M. 698, 12 P.3d 960. To do so would be to create a new contract for the State and Tesuque, and "we must give effect to the contract and enforce it as written." *Id.*

{33} Even if we viewed the 1997 Compact as a statute, the general rule is that statutes apply prospectively unless the Legislature manifests clear intent to the contrary. "[W]hen a statute affects vested or substantive rights, it is presumed to operate prospectively only." *Swink v. Fingado,* 115 N.M. 275, 279, 850 P.2d 978, 982 (1993). Furthermore, if the application of a "newly enacted law retrospectively would diminish rights or increase liabilities that have already accrued," then prospective application may be required by the Constitution. *Id.* at 290, 850 P.2d at 993; *see* N.M. Const. art. II, § 19 ("No ex post facto law, bill of attainder nor law impairing the obligation of contracts shall be enacted by the legislature."). However, statutes delineating remedial procedure are to be retroactively applied. *Wilson v. N.M. Lumber & Timber Co.,* 42 N.M. 438, 441, 81 P.2d 61, 63 (1938) ("It is true that statutes relating to practice and procedure generally apply to pending actions and those subsequently instituted, although the cause of action may have arisen before." (internal quotation marks and citation omitted)).

{34} Retroactive application of the 1997 Compact is not appropriate here. "The principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal human appeal." *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 855, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (Scalia, J., concurring). At oral argument, Gallegos relied on *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), to support her contention that Section 8 of the 1997 Compact should be applied retrospectively as Section 8 only changes the court in which Plaintiff's cause of action can be heard. Indeed, *Landgraf* states that the U.S. Supreme Court has "regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed." 511 U.S. at 274, 114 S.Ct. 1522. However, this is not a case of solely changing the jurisdictional amount-in-controversy limits or simply changing the tribunal in which the case is heard. *See id.* Rather, the 1997 Compact speaks to the rights and obligations of the parties; it affects the substantive

rights of Tesuque as a sovereign entity through its waiver of sovereign immunity and submission to the jurisdiction of the state court. *See* § 11–13–1(8); *Landgraf,* 511 U.S. at 270, 114 S.Ct. 1483 (framing the basic substantive rights inquiry as "whether the new provision attaches new legal consequences to events completed before its enactment"). Clearly, to apply the waiver of sovereign immunity and the jurisdiction-shifting provision of the 1997 Compact to Gallegos' causes of action "would diminish [Tesuque's] rights or increase [its] liabilities." *Swink,* 115 N.M. at 290, 850 P.2d at 993.

{35} Moreover, as discussed above, the plain language of the 1997 Compact delineates its effective dates and duration. Nothing in its terms evinces an intent that its provisions be applied retroactively. *See id.* at 279, 850 P.2d at 982. Finally, as with Gallegos' assertions of equitable estoppel and the applicability of the 1995 Compact, our conclusion that the 1997 Compact cannot be applied retroactively is further supported by the requirement that waivers of tribal sovereign immunity must be unequivocal and express. *See Santa Clara Pueblo,* 436 U.S. at 58, 98 S.Ct. 1670. The State and Tesuque had the opportunity to define the limitations of their agreement, and we will not infer an intent on either party's behalf contrary to both the compact's plain language and the policies underlying the protection of tribal sovereign immunity. *See Ponder,* 2000–NMSC–033, ¶ 11, 129 N.M. 698, 12 P.3d 960; *see Kiowa Tribe,* 523 U.S. at 757–60, 118 S.Ct. 1700. Thus, we conclude that retroactive application of the compact is inappropriate in this case.

### D.

{36} No one disputes that the parties to the gaming compacts sought to ensure a forum and compensation for those injured at the tribal casinos. However, in this case, neither compact covered the date of Gallegos' alleged injury at Tesuque's casino. Thus, we

conclude that neither the 1995 nor the 1997 Compact provides jurisdiction over Tesuque in state court for Gallegos' cause of action. As such, Tesuque's sovereign immunity precludes suit in state court as no waiver of its immunity will be implied under these circumstances. We therefore affirm the district court's dismissal of Gallegos' complaint against Tesuque for lack of subject matter jurisdiction in state court.

### III.

{37} We next address whether Tesuque is an indispensable party pursuant to Rule 1–019 NMRA 2002 in an action by Gallegos against Zurich, Tesuque's insurance carrier. Gallegos argues that, first, Tesuque is not an indispensable party as Zurich has failed to make the requisite showing of an impact on Tesuque's economic interests and, secondly, that Zurich has direct duties to Gallegos pursuant to the insurance contract between Zurich and Tesuque that do not implicate Tesuque's interests in this suit. We do not agree and conclude that, under the facts and circumstances of this case, Tesuque as a tribe is an indispensable party in this cause of action against its insurance carrier and dismissal is appropriate.[7]

{38} Gallegos' complaint against Zurich alleged breach of contract for failure to pay medical payments, breach of contract for asserting sovereign immunity, insurance bad faith, and unfair practices under the Trade Practices and Fraud Act. The complaint also alleged that Gallegos had a claim of liability arising from the negligent conduct of Tesuque and its "gaming enterprise," which was covered by Tesuque's insurance policy in force and effect at the time of the incident. Zurich admitted in its answer that it had issued a commercial general liability policy to Tesuque, under which it had paid some of Gallegos' claimed expenses. Zurich pleaded Rule 1–019 as an affirmative defense and, consequently, made a motion to dismiss

---

7. Throughout our review, we are mindful that this case presents itself on a motion to dismiss for failure to join an indispensable party and not a motion to dismiss for failure to state a claim. Thus, we confine our discussion only to the issue of whether Tesuque as a tribe is an indispensable party in Gallegos' suit against Zurich, arising from an incident that occurred at a tribal casino when no compact was in place. Nothing in this opinion speaks to the legal validity or invalidity of Gallegos' claims based on the New Mexico Trade Practices and Fraud Act.

based on Gallegos' failure to join Tesuque as an indispensable party, which the district court granted. The district court made no formal written findings of fact or conclusions of law but stated at the motion hearing that Tesuque's interests were implicated in the lawsuit and that the insurance contract between Zurich and Tesuque necessitated joinder.

{39} Rule 1–019 sets out a three-part analysis by which the court determines which parties are "needed for just adjudication" in any lawsuit. First, the court must determine if the questioned party is necessary to the litigation. *See* Rule 1–019(A). Second, if that party is deemed necessary, the court must then determine if joinder is possible. Third and finally, if the party cannot be joined, the court decides whether "in equity and good conscience" that party is indispensable to the litigation. Rule 1–019(B). If the party is indispensable, the court dismisses the case for nonjoinder. *Id.* "The question of indispensability is a factual question that the district court determines, and the district court decides, in its discretion, whether the suit can continue without a specific party." *Srader*, 1998–NMSC–025, ¶ 21, 125 N.M. 521, 964 P.2d 82. Thus, we review a motion to dismiss based on Rule 1–019 for an abuse of discretion. *Id.* "An abuse of discretion occurs when a ruling is clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims v. Sims*, 1996–NMSC–078, ¶ 65, 122 N.M. 618, 930 P.2d 153.

{40} On appeal, Gallegos argues the district court abused its discretion in determining that Tesuque was a necessary party, because Zurich did not "establish that as a factual matter, the Pueblo of Tesuque's economic interests might be implicated by any relief the court could fashion." Additionally, Gallegos contends that, since she only seeks money damages from Zurich "for its own bad practices" and not from Tesuque, its interests, if any, arising from the insurance contract with Zurich are not implicated. *See United States ex rel. Steele v. Turn Key Gaming, Inc.*, 135 F.3d 1249, 1252 (8th Cir. 1998) (per curiam) (concluding that tribe was not indispensable in tribal president's action to invalidate contracts where tribe supported contract invalidation and had filed suit in state court seeking similar relief as the tribal president and, thus, tribe would not be adversely affected by the litigation). She finds distinguishable those cases which conclude that, where a party seeks to void or set aside a lease or contract between another party and an immune tribe, the tribe is an indispensable party. *See Enter. Mgmt. Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890, 893–94 (10th Cir.1989); *Jicarilla Apache Tribe v. Hodel*, 821 F.2d 537, 539–40 (10th Cir.1987). She concludes that, given the nature of her causes of action, Tesuque is an unnecessary party and her claims can proceed directly against Zurich without joining Tesuque.[8]

{41} Zurich counters that it only has a duty to Tesuque to pay those sums for which Tesuque becomes "legally obligated" through

8. Gallegos relies on *Lumbermen's Mutual Casualty Co. v. Elbert*, 348 U.S. 48, 52, 75 S.Ct. 151, 99 L.Ed. 59 (1954) to support her argument that an insured is not an indispensable party in a direct action against the insurer, and, thus, the district court abused its discretion in dismissing her claims. We find this case to be inapposite. *Lumbermen's Mutual Casualty Co.* concluded that the Louisiana legislature had provided a statutory direct cause of action against an insurer; thus, the insured was not a necessary party. 348 U.S. at 52, 75 S.Ct. 151. Generally in New Mexico, "in the absence of a contractual provision or statute or ordinance to the contrary ... the injured party has no claim directly against the insurance company." *Raskob v. Sanchez*, 1998–NMSC–045, ¶ 3, 126 N.M. 394, 970 P.2d 580. An insurer may be joined in a suit against the insured by the injured party where: "1) the coverage was mandated by law, 2) it benefits the public, and 3) no language of the law expresses an intent to deny joinder." *Id.* Here, Tesuque's insurance coverage was not mandated by law, through compact or otherwise. *See id.* Thus, we are not persuaded by Gallegos' argument pursuant to *Raskob* that her suit can proceed against Zurich without Tesuque. This Court was unable to locate, nor have the parties cited in briefing, any case discussing whether a tribe is an indispensable party in an action against its insurer in a state where no direct cause of action exists statutorily and one is not provided in the insurance contract. When neither party cites any authority for a proposition, this Court presumes none exists. *See In re Adoption of Doe*, 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984); Rule 12–213(A)(4) NMRA 2002.

judgment or settlement, and thus it has no duty to Gallegos. Moreover, Zurich argues that Tesuque as a tribe has an interest in defending any claim against it and its insurance policy, an interest it cannot protect if not a party to the litigation. Under the facts and the posture of this case, we agree.

## A.

{42} We begin our analysis with the first section of Rule 1–019, which states in part:

A person who is subject to service of process shall be joined as a party in the action if:

(1) in his absence complete relief cannot be accorded among those already parties; or

(2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may:

(a) as a practical matter impair or impede his ability to protect that interest; or

(b) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of his claimed interest.

Rule 1–019(A). The determination that a party is necessary involves "a functional analysis of the effects of the person's absence upon the existing parties, the absent person, and the judicial process itself." *Srader,* 1998–NMSC–025, ¶ 22, 125 N.M. 521, 964 P.2d 82. However, no precise formula exists. *Confederated Tribes of the Chehalis Indian Reservation v. Lujan,* 928 F.2d 1496, 1498 (9th Cir.1991). "Courts demonstrate a willingness to bring in an absent person whenever there exists a reasonable possibility that the person's interests will be affected by the conclusion of an action to which he has not been made a party." *Srader,* 1998–NMSC–025, ¶ 22, 125 N.M. 521, 964 P.2d 82. The determination of whether a particular nonparty should be joined under Rule 1–019 is " 'heavily influenced by the facts and circumstances of each case.' " *Confederated Tribes of Chehalis Indian Reservation,* 928 F.2d at

1498 (quoting *Bakia v. County of Los Angeles,* 687 F.2d 299, 301 (9th Cir.1982)). Examining the facts and circumstances of this case, we conclude that Tesuque is a necessary party based on the contractual relationship between Tesuque and Zurich as well as Tesuque's interest as a sovereign entity in participating in any litigation where its rights and obligations might be adjudicated.

{43} It is the general rule in an action to void or set aside a contract that all the parties to the contract are indispensable to the litigation. *Enter. Mgmt. Consultants,* 883 F.2d at 894 (" '[N]o procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable.' " (quoting *Jicarilla Apache Tribe,* 821 F.2d at 540)); *United States ex rel. Hall v. Tribal Dev. Corp.,* 100 F.3d 476, 479 (7th Cir.1996) ("A judicial declaration as to the validity of a contract necessarily affects . . . the interests of both parties to the contract."). Clearly, an insurance policy is a contract between the insured and the insurer. *See Jaramillo v. Providence Washington Ins. Co.,* 117 N.M. 337, 340–43, 871 P.2d 1343, 1346–49 (1994). Gallegos, however, is correct that this case does not require the district court to set aside or void the insurance contract between Zurich and Tesuque to resolve her claims. Nonetheless, this lawsuit would require that the court interpret the provisions of the insurance contract, as well as determine the duties and responsibilities under the insurance policy of each of the three parties in relation to each other, as understood by the contracting parties. *See Ponder v. State Farm Mut. Auto. Ins. Co.,* 2000–NMSC–033, ¶ 11, 129 N.M. 698, 12 P.3d 960; *see also N.M. Physicians Mut. Liab. Co. v. LaMure,* 116 N.M. 92, 95, 860 P.2d 734, 737 (1993) ("The parties to an insurance contract may validly agree to extend or limit insurance liability risks."). Indeed, Gallegos' asserted causes of action inherently involve the examination of the policy and an examination of the relationship of the insurer-insured to determine any duty Zurich might have to Gallegos, and Tesuque's role, if any,

in the fulfillment of that duty.[9] *See Sanchez v. Herrera*, 109 N.M. 155, 159, 783 P.2d 465, 469 (1989) ("The reasonable expectations of the insured ... provide the criteria for examining an insurance contract on the basis both of the actual words used and of unresolved issues that the insurance company has an obligation to address."). We cannot ignore that Plaintiff asks the court to pass judgment on the conduct of Zurich under the policy pursuant to her claims for no-fault medical payments, insurance bad faith, and unfair trade practices. The propriety or impropriety of Zurich's performance under the insurance policy is of substantial interest to Tesuque, which has paid for the insurance protection in question and on whose behalf Zurich acts.

{44} New Mexico has recognized in the past that contract interpretation as to language or performance necessitated the presence of the contracting parties. *See State ex rel. Walker v. Hastings*, 79 N.M. 338, 339–40, 443 P.2d 508, 509–10 (Ct.App.1968) (stating that where state contracted with defendant and defendant's actions under that contract as to third party, who had its own agreement with the state, were at issue, "that the nature and extent of the questions which must necessarily be resolved in the interpretation of the [agreement], the fact that the [state] is one of the parties to [the] agreement, and the fact that [defendant] was acting as the agent [of the state] ... makes the [state] an indispensable party."). We are persuaded under the facts and circumstances of this case that Tesuque has a valid interest in the "judicial determination of the ... effect of [the insurance] contract and the rights of the parties thereto," which makes it necessary to the lawsuit. *Id.* at 341, 443 P.2d at 511; *see Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 862 F.Supp. 995, 1003–04 (W.D.N.Y.1994) (concluding that tribe was indispensable in franchise agreement litigation as tribe's interest in the language of the franchise agreement to which it was a party was significant).

{45} Our conclusion that Tesuque is a necessary party is further supported by the fact that we cannot say that the interests of Zurich and Tesuque in this contract and this lawsuit are so identical as to preclude the necessity of Tesuque in this litigation. *See Golden Oil Co. v. Chace Oil Co.*, 2000–NMCA–005, ¶ 13, 128 N.M. 526, 994 P.2d 772 ("[T]he interests of a necessary party will necessarily be impaired and impeded when a trial court rules in its absence, unless the interests of the absentee and one of the extant parties are truly identical"); *cf. Turn Key Gaming, Inc.*, 135 F.3d at 1252 (factoring into its indispensability analysis the identity of interests between qui tam plaintiff tribal president and tribe). In a liability action against Tesuque, Zurich and Tesuque presumably would share an identity of interests in the outcome of the litigation as Zurich has a duty to defend its insured. *See Found. Reserve Ins. Co. v. Mullenix*, 97 N.M. 618, 620, 642 P.2d 604, 606 (1982); *see also* 7C John Alan Appleman, *Insurance Law and Practice*, § 4682, at 16 (1979) ("[T]he insurer is bound to defend the insured against suits alleging facts and circumstances covered by the policy, even though such suits are groundless, false or fraudulent."). Here, however, because Gallegos is suing Zurich for alleged violation of its duties as Tesuque's insurer, we will not presume that Zurich can or will fully represent the interests of Tesuque under the policy, and thus, Tesuque is necessary to the litigation.

{46} Moreover, the fact that Zurich cannot articulate the exact amount of Tesuque's rate increase, if any, or other economic impact to Tesuque, is not fatal to Zurich's claim, as Gallegos contends. The court may consider the "economic impact caused by disputes between non-Indian parties when analyzing the practical effects of permitting litigation without a tribe's inclusion." *Srader*, 1998–NMSC–025, ¶ 25, 125 N.M. 521, 964 P.2d 82. However, economic interests are not the only interests cloaked in the protection of Rule 1–019. *See, e.g., Davis v. United States*, 192 F.3d 951, 959 (10th Cir.1999) ("The Tribe's claimed interest in determining eligibility requirements [to participate in specially funded programs] and

---

9. We decline to discuss the specific provisions of the insurance policy in this case. Although no one disputes its existence, the policy itself was not in front of the district court.

adopting ordinances embodying those requirements is neither fabricated nor frivolous."); *State v. Valdez (In re Valdez),* 88 N.M. 338, 341, 540 P.2d 818, 821 (1975) (concluding that state department of hospitals was indispensable in a proceeding questioning adequacy of treatment at mental hospital as it had "a great deal of interest ·in a proceeding which could very possibly result in an order greatly affecting its policies and operations"). Moreover, "Rule 19 does not require an absolute showing that [a party's] interest *will necessarily* be harmed by nonjoinder; rather, it is concerned that nonjoinder 'may' result in such harm."· 4 James Wm. Moore, *Moore's Federal Practice,* § 19.03[3][c], at 19–50 (3d ed.2001); *Davis,* 192 F.3d at 958 (interpreting plain language of "claims an interest" in federal Rule 19 as not to require actual possession of an interest).

{47} Most compelling, however, is that the party in question in this case is a tribe. Tesuque as a tribal entity has an interest in protecting its tribal resources and controlling their dissipation and allocation under its insurance contract. *See Atkinson v. Haldane,* 569 P.2d 151, 169 (Alaska 1977). Indeed, as a tribe, Tesuque has a compelling interest "in protecting its sovereign right to litigate on its own behalf and in the forum of its choice." *Golden Oil Co.,*2000–NMCA–005, ¶ 13, 128 N.M. 526, 994 P.2d 772; *see Srader,* 1998–NMSC–025, ¶ 33, 125 N.M. 521, 964 P.2d 82. Thus, we conclude that, in Gallegos' claims against Tesuque's· insurer, Tesuque is a necessary party, because the interpretation and construction of the contract between Zurich and Tesuque may affect Tesuque's interest as a sovereign entity in that contract, and any "disposition of the action in [its] absence may ... impair or impede [Tesuque's] ability to protect [its] interest." Rule 1–019(A)(2)(a). Tesuque is a necessary party to this action against Zurich based on the insurance contract between Tesuque and Zurich and the nature of Gallegos' causes of action.

## B.

{48} Once the court determines that a party is necessary, it evaluates whether anything precludes joinder of that party in the lawsuit. As discussed in the first section of this opinion, Tesuque is a tribal entity which enjoys sovereign immunity from suit in state court and thus cannot be joined absent an unequivocal and express waiver or the authorization of Congress. *See Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *see also Srader,*1998–NMSC–025, ¶ 29, 125 N.M. 521, 964 P.2d 82. As we determined in the preceding section of this opinion: no compact provides the state court with jurisdiction over Tesuque, Tesuque has not explicitly waived its sovereign immunity to participate in this lawsuit, and Congress has not authorized such an action against Tesuque. We need not revisit our analysis as to this point. Tesuque cannot be joined in this action. *See Srader,* 1998–NMSC–025, ¶ 29, 125 N.M. 521, 964 P.2d 82.

## C.

{49} If the court concludes that a party should be joined if feasible but cannot be joined, as in this case, Rule 1–019(B) provides:

[T]he court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

Thus, employing these enumerated, but nonexclusive, factors, the court must determine whether the litigation can proceed without the necessary party or must be dismissed, the necessary party being deemed "indispensable." *See State ex rel. Coll v. Johnson,* 1999–NMSC–036, ¶ 5, 128 N.M. 154, 990 P.2d 1277.

{50} The first factor for the court's consideration is "to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties." Rule 1–019(B). The analysis under this factor mirrors that of the "interest" inquiry of Rule 1–019(A). *Srader*, 1998–NMSC–025, ¶ 31, 125 N.M. 521, 964 P.2d 82. We have already determined above that the interpretation of the insurance contract as to Zurich could prejudice the interests of Tesuque as an absent party. Thus, "we need not revisit our conclusion concerning the substantial interests implicated by this suit." *Id.* Second, we are persuaded that no court-fashioned measures could alleviate the possible prejudice to Tesuque from not being present in an adjudication of its rights and duties under a contract to which it is a party. Contract interpretation, by its nature, requires the court to "ascertain the intentions of the contracting parties" in making their agreement. *Strata Prod. Co. v. Mercury Exploration Co.*, 1996–NMSC–016, 121 N.M. 622, 630, 916 P.2d 822, 830. No remedy can substitute for Tesuque's lack of voice as a sovereign entity in these proceedings.

{51} Finally, the Plaintiff's lack of remedy in state court, or the adequacy thereof, is not a factor to be considered in the indispensability analysis by the court where the necessary party is a tribal entity. *Srader*, 1998–NMSC–025, ¶ 33, 125 N.M. 521, 964 P.2d 82. This Court is aware that the affirmance of the district court's dismissal of Gallegos' causes of action may leave her without a remedy in state court. While we are "sympathetic to [Gallegos'] frustration at [her] inability to achieve jurisdiction over the party at the heart of the dispute, [we] cannot ignore the rule of law on joinder of parties." *Confederated Tribes of the Chehalis Indian Reservation v. Lujan*, 129 F.R.D. 171, 175 (W.D.Wash.1990). Equally, we cannot ignore the sovereign interests of Tesuque. "As a matter of public policy, the public interest in protecting tribal sovereign immunity surpasses a plaintiff[']s interest in having an available forum for suit." *Srader*, 1998–NMSC–025, ¶ 33, 125 N.M. 521, 964 P.2d 82. Indeed, " '[t]his is not a case where some procedural defect such as venue precludes litigation of the case. Rather, the dismissal turns on the fact that society has consciously opted to shield Indian tribes from suit without congressional or tribal consent.' " *Enter. Mgmt. Consultants*, 883 F.2d at 894 (quoting *Wichita & Affiliated Tribes of Okla. v. Hodel*, 788 F.2d 765, 777 (D.C.Cir. 1986)).

{52} Given the procedural posture of this case and the parties involved, we cannot agree that the district court abused its discretion in its determination that Tesuque was an indispensable party under Rule 1–019, which necessitated the dismissal of Gallegos' suit against Zurich in its entirety. Gallegos has failed to demonstrate that the district court's decision was "clearly contrary to the logical conclusions demanded by the facts and circumstances of the case." *Sims,* 1996– NMSC–078, ¶ 65, 122 N.M. 618, 930 P.2d 153.

## IV.

{53} In conclusion, we affirm the dismissal of Gallegos' complaint against Tesuque on the basis that Tesuque is a sovereign entity which had not expressly and unequivocally waived its immunity from suit in state court or consented to state court jurisdiction through a compact or otherwise. Furthermore, we affirm the dismissal of Gallegos' complaint against Zurich, Tesuque's insurance carrier, for failure to join Tesuque as an indispensable party pursuant to Rule 1–019 as Tesuque is a sovereign entity whose interests might be impeded or impaired if its obligations and rights under a contract to which it is a party were adjudicated in its absence.

{54} **IT IS SO ORDERED.**

WE CONCUR: PATRICIO M. SERNA, Chief Justice, PAMELA B. MINZNER, Justice, NEIL CANDELARIA, District Court Judge (sitting by designation) and WENDY YORK, District Court Judge (sitting by designation).