2007-NMSC-008

154 P.3d 644

Jane DOE, by and through her parents and next friend, J.H., Plaintiff–Respondent,

v.

SANTA CLARA PUEBLO, Santa Clara Development Corporation, d/b/a Big Rock Casino, Defendants–Petitioners.

Ivan Lopez and Lucy Lopez, Plaintiffs–Respondents,

v.

San Felipe Pueblo d/b/a San Felipe Casino Hollywood and CIS Insurance Group, Defendants–Petitioners.

Nos. 29,350, 29,351.

Supreme Court of New Mexico.

Feb. 23, 2007.

Rothstein, Donatelli, Hughes, Dahlstrom, Schoenberg & Bienvenu, LLP, Richard W.

Hughes, Santa Fe, NM, Maxine Velasquez, San Felipe, NM, for Petitioners.

Bennett & Kosh, Merit Bennett, Santa Fe, NM, for Respondent Doe.

Kennedy & Han, P.C., Paul J. Kennedy, Mary Y.C. Han, Rene Ostrochovsky, Albuquerque, NM, for Respondents Lopez.

Michael B. Browde, M.E. Occhialino, Albuquerque, NM, for Amicus Curiae New Mexico Trial Lawyers Association.

Catherine B. Stetson, Albuquerque, NM, for Amici Curiae Pueblo of Tesuque, Pueblo of San Felipe.

John D. Wheeler & Associates. P.C., John D. Wheeler, Alamogordo, NM, for Amicus Curiae Mescalero Apache Tribe.

Chestnut Law Offices, Peter C. Chestnut, Ann Berkley Rodgers, Albuquerque, NM, for Amicus Curiae Pueblo of Acoma.

Nordhaus, Haltom, Taylor, Taradash & Bladh, Wayne H. Bladh, Thomas J. Peckham, Rodina Cole Cave, Albuquerque, NM, for Amici Curiae Jicarilla Apache Nation, Pueblo of Laguna, Pueblo of Santa Ana, Taos Pueblo.

Sonosky, Chambers, Sachse, Endreson & Mielke, David Charles Mielke, Albuquerque, NM, for Amici Curiae Pueblo of Isleta, Pueblo of Sandia.

Bergen Law Offices, L.L.C., Leander Bergen, Albuquerque, NM, for Amicus Curiae Pueblo of San Juan.

Jana C. Werner, Santa Fe, NM, for Amicus Curiae Pueblo of Pojoaque Legal Department.

## OPINION

BOSSON, Justice.

{1} In *Gallegos v. Pueblo of Tesuque*, 2002–NMSC–012, ¶ 10 n. 3, 132 N.M. 207, 46 P.3d 668, this Court left unanswered the question whether gaming compacts between the State of New Mexico and various New Mexico Pueblos that created concurrent jurisdiction in state courts over personal injury actions against tribal-owned casinos were valid and enforceable in light of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C.

§ 2701 (2000). We now answer that question in the affirmative, holding that state courts have jurisdiction over personal injury actions filed against Pueblos arising from negligent acts alleged against casinos owned and operated by the Pueblos and occurring on pueblo lands. In so doing, we affirm the majority opinion of the Court of Appeals below. *See Doe v. Santa Clara Pueblo,* 2005–NMCA–110, 138 N.M. 198, 118 P.3d 203.

## BACKGROUND

{2} This appeal involves two separate incidents, each resulting in a personal injury lawsuit filed by a non-tribal member against a respective Pueblo. In the first action, Jane Doe, a fifteen-year-old girl, filed suit through her mother against Santa Clara Pueblo and several individuals for injuries that occurred after she was abducted by three men from Santa Clara's Big Rock Casino and sexually assaulted. Doe alleges the Pueblo failed to take reasonable safety measures to protect her while she was a guest at the casino. Specifically, the complaint alleges that Santa Clara was negligent in not providing proper lighting and security in the casino's parking lot and then in failing to make attempts to locate Doe after it became apparent that she was missing.

{3} In the second action, Lucy Lopez and her son Ivan Lopez filed suit against San Felipe Pueblo for injuries that occurred on the premises of San Felipe's Casino Hollywood. Plaintiffs were walking arm-in-arm into the casino when Ivan Lopez tripped on the corner of an unsecured floor mat causing both him and his mother to fall. Their complaint alleges that the Pueblo failed to adequately secure the floor mat thereby causing their injuries.

{4} Both sets of plaintiffs, Doe and Lopez, chose to sue the respective Pueblo in state court instead of tribal court based on a jurisdiction shifting provision contained in the gaming compact negotiated by the State and the Pueblos (the Compact) which, as will be discussed shortly, permits personal injury suits against the Pueblos to be brought in state court under certain circumstances. Doe filed suit in the First Judicial District and Lopez filed suit in the Thirteenth Judicial District. Both Santa Clara and San Felipe moved to dismiss the claims, arguing that state court lacked subject matter jurisdiction. Each district court denied the motions to dismiss, relying on the express jurisdiction shifting language in the Compact.

{5} Both Pueblos then requested interlocutory appeal. Santa Clara's request was granted, and in a formal written opinion the Court of Appeals affirmed the district court with Judge Sutin dissenting. *Doe,* 2005–NMCA–110, 138 N.M. 198, 118 P.3d 203. One week later, based on its decision in *Doe,* the Court of Appeals denied San Felipe Pueblo's request for interlocutory appeal. Both Pueblos then petitioned this Court for a writ of certiorari to determine whether the Compact between the State and each Pueblo validly confers state court jurisdiction over these personal injury claims occurring on pueblo lands. We granted certiorari to decide this important question.

## DISCUSSION

### The Compact

{6} The Compact[1] was negotiated under the comprehensive scheme of IGRA, a seminal federal statute, which "established the framework under which Indian tribes and states could negotiate compacts permitting ... gaming on Indian reservations located within state territory." *Gallegos,* 2002–NMSC–012, ¶ 9, 132 N.M. 207, 46 P.3d 668 (footnote omitted); *see* S.J. Res. 37, 45th Leg., 1st Sess. (N.M.2001). Both the Pueblos and the State were involved in negotiating the terms of the Compact under the Compact Negotiation Act. NMSA 1978, §§ 11–13A–1 to –5 (as amended 2005). That negotiation process led to the various provisions of the Compact, including Section 8, with which we are concerned in this case.[2]

1. For purposes of IGRA and for ease of reference, Tribes and Pueblos are referred to interchangeably. New Mexico has entered into gaming compacts with eleven Pueblos and two Tribes. *See* http://www.nmgcb.org/tribal/casinos.htm.

2. All of our citations to the text of the Compact were taken from the Record Proper. For reference, the text of the Compact can be found at www.nmgcb.org/tribal/2001compact.pdf.

272

{7} Section 8 of the Compact, entitled "Protection of Visitors," acknowledges that the "safety and protection of visitors to a Gaming Facility is a priority of" the parties, and that a purpose of the Compact is "to assure that any such [visitors] who suffer bodily injury or property damage proximately caused by the conduct of the Gaming Enterprise have an effective remedy for obtaining fair and just compensation." The Pueblo, therefore, "waives its defense of sovereign immunity in connection with any claims for compensatory damages for bodily injury or property damage up to the amount of fifty million dollars ($50,000,000) per occurrence asserted." *Doe*, 2005–NMCA–110, ¶ 6, 138 N.M. 198, 118 P.3d 203. The Pueblo promises to carry liability insurance in that amount.

■ {8} Following up on this concern over "safety" and an "effective remedy" for visitors, Section 8 addresses subject matter jurisdiction over personal injury claims against the Pueblos resulting from incidents occurring on Indian land in connection with Class III gaming. The pertinent language of Section 8(A) allows for personal injury actions against a Pueblo to "proceed either in binding arbitration ... or in a court of competent jurisdiction." Section 8(A) defines a court of competent jurisdiction to include state courts subject to the following condition: [A]ny such claim *may be brought in state district court,* including claims arising on tribal land, *unless it is finally determined by a state or federal court that IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court.* (Emphasis added.) As this language demonstrates, for the limited purpose of personal injury actions involving visitor safety, the parties to the Compact agreed to state court jurisdiction *unless* IGRA does not permit it. Therefore, our initial inquiry is whether Congress, in IGRA, "does not permit" tribes and states to do as the Pueblos and New Mexico have done here; that is, to negotiate provisions in a tribal-state compact for "the shifting of jurisdiction over visitors' personal injury suits to state court," including "claims arising on tribal land." This is a question of law that we review de novo. *Gallegos,* 2002–NMSC–012,

¶ 6, 132 N.M. 207, 46 P.3d 668. Accordingly, we turn our analysis to IGRA.

**IGRA's Class III Gaming Compact Provision**

{9} "IGRA was Congress' compromise solution to the difficult questions involving Indian gaming." *Artichoke Joe's Cal. Grand Casino v. Norton,* 353 F.3d 712, 715 (9th Cir.2003). As part of this solution, Congress defined three separate classes of gaming in IGRA. *See State ex rel. Clark v. Johnson,* 120 N.M. 562, 566, 904 P.2d 11, 15 (1995). Each class is subject to a different level of regulation. The issue before us pertains exclusively to Class III gaming, "the most heavily regulated and most controversial form of gambling under IGRA." *Artichoke Joe's Cal. Grand Casino,* 353 F.3d at 715.

{10} Class III gaming includes banking card games (where the house has a monetary stake in the game because players bet against the house, not just against one another); casino games such as roulette, craps, and keno; slot machines and electronic games of chance; parimutuel horse or dog wagering; and lotteries. 25 C.F.R. § 502.4 (1992). IGRA permits Class III gaming if it is (1) authorized by ordinance or resolution of the governing body of the tribe and the Chair of the National Indian Gaming Commission, (2) located in a state that permits such gaming, and (3) covered by a tribal-state compact approved by the Secretary of the Interior. 25 U.S.C. § 2710(d)(1)(A), (B), (C) (2000). We are only concerned here with the third requirement.

{11} IGRA's compact provisions require the state and tribes to negotiate a compact governing Class III gaming. 25 U.S.C. § 2710(d)(3)(A) ("Any Indian tribe having jurisdiction over the Indian lands upon which a Class III gaming activity is being conducted, or is to be conducted, shall request the State in which such lands are located to enter into negotiations for the purpose of entering into a Tribal–State compact governing the conduct of gaming activities ... [and] the State shall negotiate with the Indian tribe in good faith to enter into such a compact."). The compacts may include terms related to the application of state law and the allocation of

civil jurisdiction between the states and the tribes. IGRA specifically allows the parties to negotiate, regarding

(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are *directly related to, and necessary for, the licensing and regulation of such activity;*

(ii) the allocation of *criminal and civil jurisdiction between the State and the Indian tribe* necessary for the enforcement of such laws and regulations.

25 U.S.C. § 2710(d)(3)(C)(i), (ii) (emphasis added).

{12} Therefore, under IGRA a tribal-state gaming compact may apply state laws that are "directly related to, and necessary for, the licensing and regulation" of Class III gaming, and may then allocate criminal and civil jurisdiction to the state when it is "necessary for the enforcement" of those laws.[3] IGRA makes no other reference to jurisdiction shifting. Applying the mandate of Section 8(A) of the Compact, we must determine if IGRA "does not permit" the negotiating parties to transfer subject matter jurisdiction to state court over personal injury claims arising on Indian lands.

**Reading the Compact and IGRA Together**

{13} The Pueblos correctly note that this language in IGRA does not *expressly grant* the state and the tribes authority, as part of a Class III gaming compact, to shift jurisdiction to state courts over personal injury suits arising on Indian lands. Indeed, the language makes no mention of personal injury lawsuits. However, this point is inconsequential to the initial issue before us. The language the Pueblos agreed to in the Compact gave state courts jurisdiction over

personal injury claims, conditioned not upon IGRA *allowing* such jurisdiction shifting, but upon IGRA *not prohibiting* jurisdiction shifting. *See* Section 8(A) ("any such claim may be brought in state district court . . . unless it is finally determined by a state or federal court that IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court"). Nothing in the language of IGRA prohibits jurisdiction shifting.

{14} The Pueblos argue for a different interpretation. Judge Sutin, in his thoughtful dissent to the Court of Appeals' majority opinion, wrote that the parties to the Compact did not actually come to any agreement on jurisdiction shifting, but rather that they "expected the issue to be litigated."[4] *Doe,* 2005-NMCA-110, ¶ 28, 138 N.M. 198, 118 P.3d 203 (Sutin, J., dissenting). That observation is further developed in Justice Minzner's dissent. True, litigation may have been what the parties anticipated, and perhaps they only agreed to disagree later on in court. *See* Rebecca Tsosie, *Negotiating Economic Survival: The Consent Principle and Tribal–State Compacts Under the Indian Gaming Regulatory Act,* 29 Ariz. St. L.J. 25, 52 (1997) (noting that "the compact procedure, which was originally intended to avert contentious and expensive litigation, has resulted in more litigation than any other provision of the IGRA").

{15} However, we will not ignore the clear language of the Compact, nor can we relieve the parties to the Compact from their obligations thereunder. *See Gallegos,* 2002-NMSC-012, ¶ 30, 132 N.M. 207, 46 P.3d 668 (" '[T]he court's duty is confined to interpreting the contract that the parties made for themselves, and absent any ambiguity, the court may not alter or fabricate a new agreement for the parties.' " (quoting *Ponder v.*

---

**3.** In the Compact, the Pueblos expressly agreed that state tort law would apply to personal injury suits against casinos arising on Pueblo land. The question of jurisdiction is whether these personal injury lawsuits against the Pueblos, applying New Mexico tort law, may be filed in state court or only in tribal court. The Pueblos take the position that personal injury lawsuits against the Pueblos may only be filed in tribal court, and the tribal court would then apply state tort law in adjudicating those claims.

**4.** The Pueblos make this argument as well. In their Brief in Chief they characterize the language in the Compact as "a conditional agreement that tort cases may be filed in state court, but only if [the New Mexico Supreme Court] or a federal court finally determine[ ] that IGRA actually permits jurisdiction-shifting as to such cases." The Pueblos further assert that the language of Section 8 of the Compact was the product of a "legal tug-o'-war over the jurisdictional issue," which resulted in a Section 8 being a statement of disagreement, not agreement.

*State Farm Mut. Auto. Ins. Co.,* 2000–NMSC–033, ¶ 11, 129 N.M. 698, 12 P.3d 960)). The Compact "is a contract between the State of New Mexico and [the Pueblos], codified by the Legislature." *Id.* (citing *Texas v. New Mexico,* 482 U.S. 124, 128, 107 S.Ct. 2279, 96 L.Ed.2d 105 (1987); *see also Confederated Tribes of the Chehalis Reservation v. Johnson,* 135 Wash.2d 734, 958 P.2d 260, 267 (1998) ("Tribal-state gaming compacts are agreements, not legislation, and are interpreted as contracts.")). As with any other contract, the choice of words can be pivotal.

{16} Our analysis begins with the language utilized by the parties to the agreement. The Pueblos and the State of New Mexico agreed to jurisdiction shifting "unless" a court determines that "IGRA does not permit" it. As we have seen, there is nothing in IGRA that "does not permit" the Pueblos and the State to do exactly what they agreed to do here. Thus, based on the sole condition stipulated in the Compact, we hold that the Pueblos have consented to state court jurisdiction for the limited purpose of personal injury actions against casinos that implicate visitor safety concerns. However, we cannot stop our analysis at the Compact. For the reasons that follow, we focus again on IGRA.

### Notwithstanding the Compact, must Congress authorize jurisdiction shifting?

{17} The Pueblos assert that under general principles of Indian law "there is no basis for state court jurisdiction" in this case, unless Plaintiffs "can show that there is a governing act of Congress that authorizes such jurisdiction." In other words, regardless of the Compact language and their consent therein, the Pueblos take the position that compact language granting the state courts jurisdiction is "ineffective" absent an affirmative grant of authority from Congress to do so. To address this issue we must first examine whether without congressional authority to do so tribes can agree to state court jurisdiction over claims that would traditionally fall to tribal courts. Second, to ensure that our inquiry is as comprehensive as possible, we address whether Congress,

via IGRA, authorized the Pueblos to consent to state court jurisdiction.{18}

■ {18} We agree that, as a general proposition of Indian law derived from the sovereign status of Indian tribes, tribal courts have exclusive jurisdiction over claims arising on tribal lands against tribes, tribal members, or tribal entities. *See Williams v. Lee,* 358 U.S. 217, 219–20, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959); *Found. Reserve. Ins. Co. v. Garcia,* 105 N.M. 514, 516, 734 P.2d 754, 756 (1987). New Mexico courts recognize this general principle. *DeFeo v. Ski Apache Resort,* 120 N.M. 640, 642, 904 P.2d 1065, 1067 (Ct.App.1995) (holding injured skier suing tribal-owned ski resort limited to tribal court because injury occurred on portion of the ski resort located within tribal boundaries). However, this principle and the cases that give rise to it do not usually involve the kind of express consent to jurisdiction shifting that the Pueblos have given by compact in the context of casino gaming.

{19} The Pueblos argue that this distinction is irrelevant. They assert that without express authority from Congress their purported consent to state court jurisdiction in the Compact is ineffective. The Pueblos derive their argument from the United States Supreme Court case of *Kennerly v. District Court,* 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971).

{20} The question in *Kennerly* was whether a Montana state court had jurisdiction over a civil suit arising on Indian land and involving tribal members. *Id.* at 424. Allocation of civil jurisdiction between the tribes and the state was governed by a federal statute, Public Law No. 280 (PL 280), 18 U.S.C.A. § 1162 (1970, promulgated in 1953), which gave states the option of assuming "jurisdiction over . . . civil causes of action in Indian country." *Washington v. Confederated Bands & Tribes of Yakima Indian Nation,* 439 U.S. 463, 472–74, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979). PL 280 prescribed a specific course of action for tribes and states to follow to create civil jurisdiction in state courts over claims arising on Indian land and involving tribal members. *See Kennerly,* 400 U.S. at 424–25, 91 S.Ct. 480; 18 U.S.C.A.

§ 1162.[5] In *Kennerly*, the Blackfeet tribal council had adopted a provision in its laws giving concurrent jurisdiction to Montana state courts over suits against tribal members, but neither the state nor the tribe had followed the specific requirements of PL 280. 400 U.S. at 425, 91 S.Ct. 480 (recognizing the state had not taken formal legislative action and the tribe had not consented to state court jurisdiction by a majority vote of its enrolled members). Because the prerequisites set forth in the federal statute were not met, the Supreme Court disavowed concurrent jurisdiction in state court notwithstanding tribal consent. *Id.* at 429–30, 91 S.Ct. 480.

{21} According to some, *Kennerly* stands for the proposition that a tribe can never consent to state court jurisdiction over civil matters arising on tribal lands without the express consent of Congress. There is authority for this proposition. *See State ex rel. Peterson v. Dist. Court*, 617 P.2d 1056, 1066 (Wyo.1980) (stating that the *Kennerly* majority emphasized "a very vivid federal policy mandating the exclusive jurisdiction of tribal courts in cases involving internal tribal affairs or tribal self-government unless there has been an express delegation by Congress allowing the state to assume jurisdiction"). *See generally Cohen's Handbook of Federal Indian Law* § 6.05 (5th ed. 2005) ("Because of federal supremacy over Indian affairs, tribes and states may not make agreements altering the scope of their jurisdiction in Indian country absent congressional consent." (Citation omitted.)).

{22} The Pueblos appear to take this position. Reasoning that IGRA is like a modern day equivalent of PL 280, the Pueblos assert that they have no authority to cede jurisdiction to state courts beyond what is specifically and expressly allowed in IGRA. Because IGRA does not refer expressly to jurisdiction shifting for visitors' personal injury suits, the Pueblos conclude, as in *Kennerly*, that their contractual consent in the Compact was unauthorized, and is therefore ineffective.

{23} Other authority suggests that *Kennerly* does not reach quite so far. *See Williams v. Clark*, 742 F.2d 549, 554 (9th Cir.1984) ("[T]he Supreme Court has *implied* that a tribe may not unilaterally relinquish jurisdiction absent explicit congressional authorization and strict compliance with statutory requirements." (Emphasis added.)); *Lewis v. Sac & Fox Tribe of Okla. Hous. Auth.*, 896 P.2d 503, 508 (Okla.1994) (*Kennerly* "does not stand as authority defeating concurrent state jurisdiction *in all civil cases*. Its thrust 'is concerned solely with the procedural mechanisms by which tribal consent must be registered.' " (Citation omitted.)). Arguably, *Kennerly* stands more for a question of procedure: that when Congress sets forth requisite steps to implement jurisdiction shifting, then the state and the tribe must adhere strictly to those requirements. 400 U.S. at 427, 91 S.Ct. 480; *see also Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. at 478–84, 99 S.Ct. 740 (examining whether Washington's assumption of jurisdiction over the Yakima Nation complied with PL 280); *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 180–81, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973) (holding Arizona could not tax income earned by Indians from reservation sources because the state tax statute did not strictly comply with PL 280). Under this more limited view, *Kennerly* would govern what states and tribes must do when Congress has clearly spoken, but not necessarily what they must do when Congress remains reticent.

{24} Arguably, Congress' decision to adopt legislation, such as IGRA, that specifically allows states and tribes to enter into jurisdictional agreements, but leaves the circumstances up to the parties to define, is markedly different from the global, one-size-fits-all jurisdiction shifting involved in PL 280. *See Cohen's, supra* § 6.05 (noting that the Indian Child Welfare Act and IGRA are such pieces of legislation). The *Kennerly* court simply may not have envisioned anything like IGRA. Thus, based on the different ways courts interpret its holding, and the added

---

**5.** As the Court of Appeals correctly noted, New Mexico has never elected to assume jurisdiction over tribal lands under PL 280. Thus, the State

cannot derive jurisdiction from that statute. *See Doe*, 2005–NMCA–110, ¶ 8, 138 N.M. 198, 118 P.3d 203.

confusion of IGRA's impact, it seems far from clear that *Kennerly* is controlling here.

{25} *Kennerly* did not involve a comprehensive compact, entered into in furtherance of federal legislation, and painstakingly negotiated between the tribes and the states, in which the tribes conceded state court civil jurisdiction in exchange for substantial benefits—in this case the ability to conduct Class III gaming on tribal lands. A separate body of federal case law has developed interpreting tribal authority in the context of consensual contracts. One recent case, *C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Okla.*, 532 U.S. 411, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001), addresses a tribe's ability to waive its immunity by contract and consent to state court jurisdiction.

{26} In *C & L Enterprises*, the tribe entered into a construction contract with a private contractor to install a roof on a building owned by the tribe. *Id.* at 414, 121 S.Ct. 1589. In the contract, the tribe consented to arbitration and agreed that the contract was to be "governed by the law of the place where the Project is located," in that case outside tribal boundaries within the state of Oklahoma. *Id.* at 415, 121 S.Ct. 1589 (quoted authority omitted). The Supreme Court was asked to determine "whether the Tribe waived its immunity from suit in *state court*" based on the contractual agreement. *Id.* at 414, 121 S.Ct. 1589 (emphasis added). In a unanimous decision, making no reference to *Kennerly*, the Supreme Court found that the tribe had consented to arbitration and had included a choice-of-law clause that had the effect of authorizing jurisdiction in the Oklahoma state courts, and therefore, the tribe had waived its immunity. *Id.* at 419, 121 S.Ct. 1589. Thus, by agreement and entirely without congressional authority, the tribe waived its sovereign immunity, and more importantly, was "amenable to a state-court suit" to enforce an arbitration award. *Id.* at 414, 121 S.Ct. 1589.

{27} Taken in context, *C & L Enterprises* suggests that when a sovereign tribe waives its immunity from suit, it may also choose the forum in which the resulting litigation will occur, including state court, whether or not it has express congressional authority to do so. In the context of similar business agreements, other courts appear to agree. *See Bradley v. Crow Tribe of Indians*, 315 Mont. 75, 67 P.3d 306, 308, 311–12 (2003) (holding that tribe had waived its sovereign immunity and could be sued in state court by agreeing to state law and to state court jurisdiction in a standard construction contract provision on choice of law and venue); *Rush Creek Solutions, Inc. v. Ute Mountain Ute Tribe*, 107 P.3d 402, 404, 406 (Colo.Ct.App.2004) (holding the tribe had waived its immunity and state court had jurisdiction based on a legally enforceable contract in which tribe consented to state court jurisdiction).[6]

---

6. The Pueblos argue that *C & L Enterprises* does not apply here because the only concern in that case was whether there was a valid waiver of immunity; state court jurisdiction was not at issue because the contract governed a construction project that was outside the reservation, and thus there was clearly state court jurisdiction. 532 U.S. at 414, 121 S.Ct. 1589. We do not believe that sovereign immunity and subject matter jurisdiction are as distinct as the Pueblos argue. A waiver of immunity in state court inherently involves a state court's subject matter jurisdiction, and immunity waiver claims are often phrased as subject matter jurisdiction claims. *See Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998) (when sued in state court, tribe "moved to dismiss for lack of jurisdiction, relying in part on its sovereign immunity"); *Campo Band of Mission Indians v. Superior Court*, 137 Cal.App.4th 175, 183, 39 Cal.Rptr.3d 875 (2006) (discussing a "motion asserting sovereign immunity as a basis for dismissing an action for lack of subject matter jurisdiction"); *Kizis v. Morse Diesel Int'l, Inc.*, 260 Conn. 46, 794 A.2d 498, 502 (2002) ("[T]he doctrine of sovereign immunity implicates subject matter jurisdiction." (Quoted authority omitted.)); *Danka Funding Co., LLC v. Sky City Casino*, 329 N.J.Super. 357, 747 A.2d 837 (Law Div.1999) (claiming that the court lacked subject matter jurisdiction because the tribe had sovereign immunity); *Gallegos*, 2002–NMSC–012, ¶ 6, 132 N.M. 207, 46 P.3d 668 (the Court examined if the tribe had waived its immunity from suit in addressing "whether the district court had subject matter jurisdiction over the claim"). Putting this connection between the two issues aside, we agree with the Pueblos that a waiver of immunity does not automatically give state courts jurisdiction; the waiver may only apply in tribal courts. *See Garcia v. Akwesasne Hous. Auth.*, 268 F.3d 76, 87 (2d Cir.2001) (a contract clause can constitute a waiver of immunity *"only in the courts of the sovereign "*). However, it does not follow from this distinction between immunity waivers

{28} However, no federal statute was involved in *C & L Enterprises,* unlike IGRA here and PL 280 in *Kennerly.* Also, in *C & L Enterprises* the lawsuit arose from activity outside of tribal boundaries. Thus, there appear to be two separate lines of authority addressing a tribe's ability to consent to state court jurisdiction: (1) the *Kennerly* line, where a specific federal statute prescribes a course of action that must be followed to shift jurisdiction, but without any comprehensive agreement between the tribes and the state; and (2) the *C & L Enterprises* line, where a consensual business agreement exists between the tribe and another party, but there is no federal statute that governs jurisdiction shifting. Our case seems to fit somewhere in between.

{29} In the context of casino gaming, we have a tribal-state contract, like *C & L Enterprises,* and also a federal statute, like *Kennerly.* Thus, to determine if the Pueblos had the authority to consent to state court jurisdiction in the Compact, we cannot focus solely on the *C & L Enterprises* line of cases and look no further than the Compact language. For the reasons stated earlier, *Kennerly* is not exactly on point either in answering the specific inquiry before us. Nonetheless, in line with *Kennerly,* 400 U.S. at 425–29, 91 S.Ct. 480, we will look beyond the language of the Compact to determine if IGRA *authorizes* the Pueblos to shift jurisdiction over personal injury suits to state court. In so doing, we assume, without deciding, that IGRA is similar to PL 280 in the sense that it provides a comprehensive scheme governing tribal gaming which includes some allowance for jurisdiction shifting, and like PL 280 must be followed. Therefore, we turn to whether IGRA authorizes jurisdiction shifting in the context of personal injury suits.

**Does IGRA authorize jurisdiction shifting to state court?**

■ {30} As noted earlier, IGRA expressly authorizes the application of state laws "that are directly related to, and necessary for, the licensing and regulation" of gaming. IGRA also authorizes compacting parties to allocate jurisdiction between the state and the tribe (jurisdiction shifting) that is "necessary for the enforcement of such laws and regulations." 25 U.S.C. § 2710(d)(3)(C). Unfortunately, Congress did not define what it meant by "regulating" gaming activity and what might be "necessary for the enforcement" of such laws and regulations. Therefore, we look to evidence of congressional intent to decide whether jurisdiction over visitors' personal injury suits is something that tribes and states may negotiate in a gaming compact.

**Legislative History**

{31} The history leading up to the passage of IGRA illustrates what Congress intended when it included the compact provision in IGRA. Although IGRA was passed in 1988, similar legislation had been contemplated for at least five years. *See Doe,* 2005–NMCA–110, ¶ 12, 138 N.M. 198, 118 P.3d 203 (citing 129 Cong. Rec. 34,184 (1983)). *See generally* Roland J. Santoni, *The Indian Gaming Regulatory Act: How Did We Get Here? Where Are We Going?,* 26 Creighton L.Rev. 387, 395 (1993). During that time, seven different bills addressing Indian gaming were introduced in Congress. *See* Santoni, *supra,* at 396–403 (these bills included H.R. 4566, H.R. 1920, H.R. 2404, S. 902, H.R. 2507, S. 1303, and S. 555 that became IGRA). In each version, Congress struggled with the question of where regulatory authority over gaming on Indian lands would lie—with the federal government, the states, or the tribes. The major dispute involved the reach of the state's regulatory authority over gaming on Indian land. *See id.* at 398. The tribes had serious concerns about any law that would impose state regulation over tribal activity on

---

and consent to state court subject matter jurisdiction that a tribe has the authority to waive immunity but does not have the authority to consent to subject matter jurisdiction. *See Garcia,* 268 F.3d at 86–87 ("courts consistently have applied two complementary principles to waivers [of immunity]: (1) a sovereign's waiver must be unambiguous, and (2) a sovereign's interest 'encompasses not merely *whether* it be sued, but *where* it may be sued'" (quoting *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 241, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985))); *Bradley,* 67 P.3d at 310 ("We have previously acknowledged ... that Indian tribes may waive their right to sovereign immunity *and* consent to suit in state courts." (Emphasis added.)).

Indian land. *See id.* at 402–03 (noting that S. 1303 was favored by tribes because it did not apply state law to Class III gaming but rather allowed the tribes and the federal government to govern gaming while incorporating state law into its regulations). The states, on the other hand, wanted complete regulatory control over Class III gaming. *See id.* at 398 (noting, that in discussing S. 902, the Arizona Attorney General felt that gaming should be governed strictly by state law).

{32} Congress devised the compact provision to resolve this dispute over regulation of Class III gaming. The version of S. 555 that ultimately became IGRA was introduced in August 1988, and was the first version to include the concept of a tribal-state gaming compact. *See* Santoni, *supra. See generally* Sidney M. Wolf, *Killing the New Buffalo: State Eleventh Amendment Defense to Enforcement of IGRA Indian Gaming Compacts,* 47 Wash. U.J. Urb. & Contemp. L. 51, 85–86 (1995) (noting the sudden appearance of the tribal-state compact provision). By relying upon a compact negotiated by tribes and states, Congress was able to take into account the diverse interests of tribes and states without directly answering the difficult question of where regulatory jurisdiction over gaming on Indian lands would lie. *See State ex rel. Clark,* 120 N.M. at 566 120 N.M. at 566, 904 P.2d at 15 ("Congress attempted to strike a balance between the rights of tribes as sovereigns and the interests that states may have in regulating sophisticated forms of gambling.").

{33} Thus, instead of Congress allocating jurisdiction between the tribes and states, the compact provision allowed the tribes and states to negotiate and decide for themselves the division of civil, criminal, and regulatory responsibility. *See* 25 U.S.C. § 2710(d)(3); *see also* Santoni, *supra,* at 407 ("Congress introduced the Tribal–State compact concept, rather than require tribes to accept state law and jurisdiction, as a condition to conducting Class III gaming."); Wolf, *supra,* at 86 ("In sum, Congress 'punted' the issue of deciding state versus tribal jurisdiction to the states and tribes to negotiate amongst themselves on a case-by-case basis."). This history

strongly suggests that the Class III compacting provision was intended to be broad enough to allow the tribes and the states to work out between themselves solutions to the jurisdictional issues that had eluded Congress.

{34} The Pueblos take a narrower view of IGRA. They argue that while Congress intended the parties to negotiate gaming compacts, Congress also put limitations on what could be included in these compacts. Specifically, the Pueblos assert that Congress only intended to permit jurisdiction shifting as it related to controlling organized crime, and that Congress did not intend to broaden the reach of jurisdiction shifting to include such extrinsic matters as personal injury actions against casinos.

{35} We agree with the Pueblos that one of the primary purposes behind IGRA's Class III gaming provisions was to thwart organized crime by allowing the introduction of state regulation, state laws, and state venue. There is ample support for this conclusion. IGRA itself states that one of its intended purposes is to protect tribal gaming from infiltration by organized crime. 25 U.S.C. § 2702(2). The legislative history of IGRA, as contained in the Senate Select Committee on Indian Affairs (Senate Committee) report, reflects the fear that allowing tribal gaming would open the door to infiltration by organized crime. *See* S.Rep. No. 100–446, at 2 (1988), U.S.Code Cong. & Admin.News 1988, at 3071 ("The need for Federal and/or State regulation of gaming, in addition to, or instead of, tribal regulation, has been expressed by various State and Federal law enforcement officials ....."); *see also Artichoke Joe's Cal. Grand Casino,* 353 F.3d at 715 (IGRA was passed in part to "shield [tribal gaming] from organized crime"); *Pueblo of Santa Ana v. Kelly,* 932 F.Supp. 1284, 1292 (1996) (*Kelly I* ) (examining purpose behind Class III gaming compact provision and stating that the central purpose is "to protect against the infiltration of organized crime into high-stakes gaming").

{36} While preventing criminal infiltration into tribal gaming was certainly one purpose behind the Class III compact, it was clearly not the *sole* purpose. *See* S.Rep. No. 100–

446, at 5, U.S.Code Cong. & Admin.News 1988, at 3075 (noting the views of Senator McCain that "in 15 years of gaming activity on Indian reservations, there has never been one clearly proven case of organized criminal activity"). "Congress looked to the compacting process primarily as a means of balancing state and tribal interests." *Artichoke Joe's Cal. Grand Casino,* 353 F.3d at 726. The Senate Committee identified several state interests beyond concerns over organized crime that factor into this balance. A state's governmental interests with respect to class III gaming on Indian lands include the interplay of such gaming with the State's *public policy, safety, law, and other interests,* as well as impacts on the State's regulatory system, including its economic interest in raising revenue for its citizens. S.Rep. No. 100–446, at 13 (emphasis added). The inclusion of broad state interests such as "safety," "law," and "public policy"—references that could easily encompass the future of personal injury suits against tribal casinos—in the discussion of regulatory authority over gaming, suggests that the Senate Committee did not intend to confine the scope of compact negotiations on jurisdiction shifting to the prevention of organized crime. *See Kelly I,* 932 F.Supp. at 1296 ("IGRA's provisions reveal that Congress took great pains to provide states a meaningful opportunity to become *intimately involved in the regulation of gaming* in order to protect themselves and the tribes from gaming's possible negative effects." (Emphasis added.)).

{37} The legislative history indicates that Congress took a more expansive view toward IGRA's compact provision, one that would afford tribes and states both control and flexibility in shaping the fundamental aspects of regulatory authority over gaming. *See* 134 Cong. Rec. S12643–01 (1988) ("The Tribal/State compact language intends that two sovereigns will sit down together in a negotiation on equal terms and at equal strength and come up with a method of regulating Indian gaming."); *see also Doe,* 2005–NMCA–110, ¶ 4, 138 N.M. 198, 118 P.3d 203 ("Ultimately, Congress adopted a flexible solution that allowed competing state and tribal interests to be balanced on a case-by-case basis."). As Senator Inouye, then-Chair of

the Senate Committee, explained, "the idea is to create a consensual agreement between the two sovereign governments and *it is up to those entities to determine what provisions will be in the compacts.*" 134 Cong. Rec. S12643–01 (emphasis added).

{38} The Senate Committee explicitly advanced a broad reading of the jurisdiction shifting provisions, observing that the "subparts of each of the *broad* areas may be more inclusive," and the tribal-state compact "may allocate most or all of the jurisdictional responsibility to the tribe, to the State or to any variation in between." S.Rep. No. 100–446, at 14, U.S.Code Cong. & Admin.News 1988, at 3084. The Senate Committee thus revealed its intent to leave the negotiating parties free to define the scope of state regulatory jurisdiction as narrowly or as broadly as they may see fit. *See* S.Rep. No. 100–446, at 6, U.S.Code Cong. & Admin.News 1988, at 3076 (stating the intention "that to the extent tribal governments *elect to relinquish rights in a tribal—State compact that they might have otherwise reserved,* the relinquishment of such rights shall be specific to the tribe so making the election" (emphasis added)). By allowing the compact parties ample room to negotiate matters of regulatory jurisdiction, Congress intended to ensure that the compact process was "a viable mechanism for setting *various matters* between two equal sovereigns." S.Rep. No. 100–446, at 13, U.S.Code Cong. & Admin.News 1988, at 3083 (emphasis added); *see also Pueblo of Santa Ana v. Kelly (Kelly II),* 104 F.3d 1546, 1554 (10th Cir. 1997) ("[T]he legislative history of [IGRA] is replete with references to the need to accommodate tribal *and* state interests. . . .").

{39} The broad compact negotiating process by which Congress sought to ensure that states could protect their interests in public policy, safety, and laws, may reasonably be interpreted to include the issue of jurisdiction over personal injury suits. *See Doe,* 2005–NMCA–110, ¶ 17, 138 N.M. 198, 118 P.3d 203 ("Redressing injuries sustained by the Casino's visitors is sufficiently related to the regulation of tribal gaming. . . ."). Issues of safety, law, and public policy play a significant role in tort suits. Personal injury

law is meant, in part, to expose weaknesses in safety procedures and protect the public from safety hazards. *See generally* Dan B. Dobbs, *The Law of Torts* § 5, at 8 (2000) (indicating tort law "can be seen as [a] means of imposing a degree of social control by preventing injury or compensating it"); *id.* § 6, at 10 ("Tort law is . . . one of a number of ways in contemporary American society aimed at creating incentives for safety or at providing compensation for loss or both."). Tort suits are thus related to gaming activity in helping ensure that gaming patrons are not exposed to unwarranted dangers, something that inures to the benefit of the Tribes.

{40} In drafting IGRA, Congress was aware that the "vast majority of consumers of [tribal gaming] would be non-Indian citizens of the State and tourists to the state." 134 Cong. Rec. H8146–01 (1988). Protecting the personal safety of those outside visitors and consumers would seem to be of mutual concern to both the state and the tribes. *See* Section 8 (providing under section entitled "Protection of Visitors" for the application of New Mexico tort law and jurisdiction shifting). This protection necessarily extends to personal injuries sustained by those patronizing the casinos and providing assurances of an effective remedy. Congress could rationally conclude that tribes ought not to be foreclosed from negotiating such provisions perceived to be in their own interest, and as "directly related to, and necessary for, the licensing and regulation" of gaming.

{41} In this case, the State of New Mexico and the Pueblos agreed to apply New Mexico tort law, instead of Pueblo law, to lawsuits arising out of those personal injuries. By that action, the State and the Pueblos agreed that the application of New Mexico state law was authorized by IGRA; that it was, in the language of IGRA, "directly related to, and necessary for, the licensing of and regulation of such activity." It follows that providing a forum or a choice of more than one forum is, in the language of IGRA, "necessary for the enforcement of such [state tort] laws," which cannot be enforced in the context of a lawsuit without a forum. Thus, in IGRA, Congress foresaw that the states and the tribes *may* want to negotiate a choice of forum along with a choice of law to accommodate visitors' personal injury lawsuits. As part of the broad language utilized in IGRA, we are satisfied that Congress envisioned such a choice. *See Gallegos,* 2002–NMSC–012, ¶ 36, 132 N.M. 207, 46 P.3d 668 ("No one disputes that the parties to the gaming compacts sought to ensure a *forum* and compensation for those injured at the tribal casinos." (Emphasis added.)).[7]

{42} Again, the Pueblos dispute such a broad interpretation, arguing instead that the phrase "directly related to, and necessary for" the regulation of Class III gaming was meant to be language of limitation on what the tribes and states could agree to in the Class III compacts regarding jurisdiction. *See Doe,* 2005–NMCA–110, ¶ 30, 138 N.M. 198, 118 P.3d 203 (stating provision of IGRA at issue in this case is "permissive and limited") (Sutin, J., dissenting). We agree that the states could not take unfair advantage of this jurisdiction shifting authority to pres-

7. In their consolidated brief, *amici* Pueblos of Acoma, Isleta, Laguna, Sandia, San Juan, Santa Ana, and Taos, as well as the Jicarilla Apache Nation, argue that this Court should look to the U.S. Department of Interior, Office of Indian Gaming Management's interpretation of IGRA. In a January 2000 letter, that agency informed the New Mexico Legislative Committee on Compacts that IGRA's "authorization for the allocation of civil jurisdiction would not extend to a patron's tort claim because it is an area that is not directly related to, and necessary for, the licensing and regulation of class III gaming activity." It is true that the judiciary should usually afford deference to the responsible agency's interpretation of a statute. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). However, interpretations found in opinion letters "lack the force of law" and thus "do not warrant *Chevron*-style deference." *Christensen v. Harris County,* 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). *Chevron* involved an agency regulation promulgated based on the agency's interpretation. 467 U.S. at 842–44, 104 S.Ct. 2778. This letter was not a regulation promulgated by the Office of Indian Gaming Management. The United States Supreme Court has made clear that opinion letters do not deserve the deference afforded to agency regulations and interpretations "arrived at after . . . a formal adjudication or notice-and-comment rulemaking." *Christensen,* 529 U.S. at 587, 120 S.Ct. 1655. Thus, while we may give that opinion letter such consideration as it deserves, but not "*Chevron*-style deference." *Id.*

sure tribes into surrendering rights in other areas. *See id.* ¶ 17. Certainly, there are limits. However, the legislative history exposes exactly what those limits are. The Committee report states that "[i]n no instance, does [IGRA] contemplate the extension of State jurisdiction or the application of State laws for any other purpose." S.Rep. No. 100–446, at 6, U.S.Code Cong. & Admin.News 1988, at 3076. As demonstrated by the legislative history, the "other purposes" that Congress intended to exclude from state jurisdiction in the Compact were those patently unrelated to gaming. Senator Inouye listed these areas which could not be negotiated as "taxation, water rights, environmental regulation, and land use." 134 Cong. Rec. S12643–01. Thus, by inference, when Congress tells us what is off-limits to jurisdiction shifting because not sufficiently related to regulation, we can fairly presume that other subjects falling outside those express categories are not excluded from state court jurisdiction. *See, e.g., Andrus v. Glover Const. Co.,* 446 U.S. 608, 616–17, 100 S.Ct. 1905, 64 L.Ed.2d 548 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.").

{43} We also find persuasive the Court of Appeals' discussion of other provisions in the Compact that on their face do not seem to be directly related to the regulation of gaming activity. *See Doe,* 2005–NMCA–110, ¶ 18, 138 N.M. 198, 118 P.3d 203. For example, if the Compact can include provisions on alcohol service, labor conditions, employment discrimination, and liability insurance, then it would not make sense to read IGRA so narrowly as to exclude provisions related to jurisdiction over personal injury claims. *Id.* Those provisions were included in the Compact, just as the jurisdiction shifting provision was included, because the State and the Pueblos understood their importance, and IGRA allows the two interested parties to work such matters out for themselves.

{44} We find further support for our conclusion that Congress intended tribes and states to negotiate the issue of state court jurisdiction over civil claims in the fact that

many tribal-state compacts in other states arising out of IGRA do include specific provisions on this issue. *See Diepenbrock v. Merkel,* 33 Kan.App.2d 97, 97 P.3d 1063, 1068 (2004) (compact giving the tribe civil jurisdiction over tort claims arising from injuries to patrons of gaming facilities); *Bonnette v. Tunica–Biloxi Indians,* 873 So.2d 1, 6 (La.Ct. App.2003) (compact requiring the tribe to *"adopt reasonable procedures for the disposition of tort claims"* of gaming facility patrons (quoted authority omitted)); *Kizis,* 794 A.2d at 504 (Conn.2002) (tribal compact providing that the tribe will create a remedial system for disposition of tort claims against it). While all these compacts give subject matter jurisdiction over personal injury claims to the tribes, unlike the Compact here which grants concurrent jurisdiction to the State, the inclusion of a provision granting jurisdiction, regardless of what party it is given to, indicates that personal injury suits are sufficiently related to gaming to be included in the tribal-state compacts.

{45} For all of these reasons, we are persuaded that Congress intended the compacting provision of IGRA to allow the states and the tribes broad latitude to negotiate regulatory issues. There is no question that when Congress sets forth specific conditions for jurisdiction shifting, as it did over fifty years ago in PL 280, then, as in *Kennerly,* those necessary steps must be followed. However, while IGRA resembles PL 280 in the sense that Congress did envision jurisdiction shifting for gaming purposes, it is unlike PL 280 in that it does not set forth a specific roadmap of how such jurisdiction shifting should be accomplished. Rather, IGRA leaves the issue to negotiation subject only to broad guidelines. That was Congress' choice. It is not for us to demand of Congress a specificity it was unwilling or unable to provide. We need only satisfy ourselves that Congress envisioned, and authorized, tribes to contract for jurisdiction shifting, if they wished, as part of a much larger, global settlement of complex issues that was necessary to make tribal gaming work. IGRA and its history satisfies our inquiry.

## Traditional Indian Law Canons of Construction

{46} The Pueblos further argue that their interpretation of IGRA should prevail based on the *Blackfeet* presumption, which requires ambiguities found in statutes enacted for the benefit of an Indian tribe to be interpreted in favor of the tribe. *See Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985); *Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); *Artichoke Joe's Cal. Grand Casino*, 353 F.3d at 729. The Pueblos assert that this canon should be applied here because the Senate Committee acknowledged this standard of statutory construction. In its report on IGRA, the Senate Committee explicitly stated that, when construing IGRA, courts should "interpret any ambiguities on these issues in a manner that will be most favorable to tribal interests." S.Rep. No. 100–446, at 15, U.S.Code Cong. & Admin.News 1988, at 3085. However, "ambiguity is a prerequisite" for application of the *Blackfeet* presumption. *Artichoke Joe's Cal. Grand Casino*, 353 F.3d at 729. To determine ambiguity courts can look beyond the text of the federal statute and also examine its "context, purpose, and legislative history." *Id.* at 731; *see also Cohen's*, supra § 7.02(1)(b) (suggesting canons should be applied if Congress' intent is not clear "either through express language or through clear and reliable evidence in the language or legislative history").

{47} Although the text of IGRA is open to some interpretation, we are convinced after examining the legislative history that Congress' intent is clear. For the reasons stated earlier, Congress intended this particular provision of IGRA to give the tribes and states ample room to negotiate. The states and the tribes were to resolve regulatory jurisdiction issues for themselves. For the reasons discussed earlier, we are persuaded that Congress intended the parties to negotiate, if they wished, the choice of laws for personal injury suits against casinos as well as a choice of venue for the enforcement of those laws. Nothing in IGRA required the tribes to negotiate the subject, nor does anything in IGRA prevent them from doing so. Congress unambiguously left that subject to the parties to determine for themselves. Without an ambiguity, the *Blackfeet* presumption does not apply.

## CONCLUSION

{48} For the foregoing reasons, we affirm the Court of Appeals and remand to the respective state district courts for further proceedings consistent with our holding.

{49} **IT IS SO ORDERED.**

WE CONCUR: EDWARD L. CHÁVEZ, Chief Justice, PATRICIO M. SERNA, and PETRA JIMENEZ MAES, Justices.

PAMELA B. MINZNER, Justice (dissenting).

MINZNER, Justice (dissenting).

{50} I respectfully dissent. I agree with Judge Sutin, who dissented from the Court of Appeals' majority opinion, that the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. § 2701 (2000), does not permit tribes and states to agree to shifting jurisdiction from tribal court to state court and thus does not allow the State to exercise jurisdiction over visitors' personal injury claims arising on Indian land. *Doe v. Santa Clara Pueblo*, 2005–NMCA–110, ¶ 21, 138 N.M. 198, 118 P.3d 203 (Sutin, J., dissenting).

{51} My colleagues seem to rest their analysis at least in part on what IGRA does *not* say, as opposed to what it *does* say. Maj. Op. ¶¶ 13, 16. The majority opinion holds initially that "[t]he language the Pueblos agreed to in the Compact gave state courts jurisdiction over personal injury claims conditioned not upon IGRA *allowing* such jurisdiction shifting, but upon IGRA *not prohibiting* jurisdiction shifting." *Id.* ¶ 13. Subsequently, within the opinion, my colleagues assume for purposes of this appeal that IGRA must be construed to determine whether it authorizes jurisdiction shifting. *Id.* ¶ 29. Still later in the opinion, then, consistent with this assumption, my colleagues identify indicia of legislative intent. *Id.* ¶¶ 36–41. The indicia identified seem at best ambiguous. After attempting to construe IGRA, I believe we should recognize

that its text is ambiguous, and under these circumstances, the presumption of *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985), applies. Therefore I would reverse the Court of Appeals and the district court and remand with directions to dismiss both complaints.

{52} In his dissent, Judge Sutin argued that because tribal courts retain jurisdiction over claims arising on tribal lands against tribes, and because New Mexico elected not to assume jurisdiction over tribal lands, jurisdictional authority must come from IGRA. *Doe v. Santa Clara Pueblo*, 2005–NMCA–110, ¶ 24, 138 N.M. 198, 118 P.3d 203 (Sutin, J., dissenting). In analyzing Section 2710(d)(3)(C) of IGRA, he reasoned that visitors' personal injury claims arising on tribal land do not fall within the scope of jurisdiction required for the enforcement of laws and regulations directly related to and necessary for licensing and regulation of Class III gaming. *Id.* ¶ 26. He then examined the language of IGRA and determined it does not expressly allow the parties to the Compact to agree to shifting jurisdiction over visitors' personal injury claims, which indicates a legislative intent to preserve exclusive tribal jurisdiction over such claims. *Id.* ¶ 30. Finally, Judge Sutin asserted that because IGRA does not permit the tribes to consent to shifting jurisdiction, the Compact cannot evade the rule of exclusive tribal jurisdiction over general tort actions arising on Indian land established in *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). *Doe v. Santa Clara Pueblo*, 2005–NMCA–110, ¶ 35, 138 N.M. 198, 118 P.3d 203 (Sutin, J., dissenting). I agree.

{53} The pertinent language of IGRA reads,

Any Tribal–State compact negotiated under subparagraph (A) may include provisions relating to—

(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity;

(ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations . . .

(vii) any other subjects that are directly related to the operation of gaming activities.

25 U.S.C. § 2710(d)(3)(C)(i), (ii), (vii). In his dissent, Judge Sutin noted the significant absence of any discussion "regarding whether the IGRA was to permit an allocation of jurisdiction beyond that necessary for the enforcement of laws and regulations directly related to and necessary for licensing and regulation of Class III gaming activities." *Doe*, 2005–NMCA–110, ¶ 34, 138 N.M. 198, 118 P.3d 203 (Sutin, J., dissenting). I agree with Judge Sutin's observation that allocating jurisdiction over visitors' personal injury claims would not seem to be "necessary for the enforcement of laws and regulations that are directly related to, and necessary for licensing and regulation of Class III gaming activities." *See id.* ¶ 26. Had Congress intended for such claims to be included, I think IGRA would have been explicit, and we would not need to parse its legislative history for indicia of legislative intent. Even allowing for the fact that there were many issues to be resolved in negotiating compacts, IGRA seems to me to take a narrow view of what jurisdiction shifting, if any, was likely to occur. The phrase "directly related to and necessary for the licensing and regulation" of gaming activities seems restrictive rather than expansive.

{54} As Judge Sutin argued, because IGRA does not expressly grant jurisdictional authority over these claims, we cannot evade the *Williams* rule of exclusive tribal jurisdiction over general tort actions arising on Indian land. *See Williams*, 358 U.S. 217, 79 S.Ct. 269. At best, in light of IGRA's silence on the matter and the *Williams* rule, we are obliged to adhere to the *Blackfeet* presumption and hold the apparent ambiguities in IGRA should be construed in favor of the tribes. If we do not accept the tribes' argument that shifting jurisdiction is prohibited because IGRA does not plainly provide for it, we should hold that silence to be, at the very least, ambiguous, and then apply the *Blackfeet* presumption.

{55} Judge Sutin's determination that the parties expected this issue to be litigated also seems accurate. *Doe v. Santa Clara Pueblo*, 2005–NMCA–110, ¶ 28, 138 N.M. 198, 118

P.3d 203 (Sutin, J., dissenting). Section 8(A) of the Compact says,

[A]ny such claim may be brought in state district court, including claims arising on tribal land, unless it is finally determined by a state or federal court that IGRA does not permit the shifting of jurisdiction over visitors' personal injury suits to state court.[1]

Therefore, I cannot reconcile the majority opinion's conclusion that "we will not ignore the clear language of the Compact," with the language of Section 8(A), which explicitly leaves the issue unresolved. Maj. Op. ¶ 15.[2]

{56} I would conclude the Compact's shifting jurisdiction is not authorized by IGRA in unambiguous terms, and because shifting jurisdiction over visitors' personal injury claims was not explicitly authorized by IGRA, presume the tribes' exclusive jurisdiction over such claims must prevail. My colleagues being of a different view, I respectfully dissent.

---

1. See http://www.nmgcb.org/tribal/2001compact.pdf.

2. I would note the clarity of Section 8(A) of the Indian Gaming Compacts entered into in 1997, see NMSA 1978, § 11–13–1, in comparison with the text of Section 8(A) of the Compact entered into in 2001. See generally Doe v. Santa Clara Pueblo, 2005–NMCA–110, ¶ 5, 138 N.M. 198, 118 P.3d 203 (discussing the history of the 2001 Compact). Section 8(A) of the 1997 Compact provides explicitly for jurisdiction shifting. "[C]oncurrent civil jurisdiction in the State courts and the Tribal courts shall apply to a visitor's claim for bodily injury or property damage proximately caused by the conduct of the Gaming Enterprise." Section 11–13–1.