This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**IN RE: THE ESTATE OF
ENCARNACION S. RIVERA,
(Deceased December 16, 1966)
San Miguel Probate Court No.:
D-412-PB-1967-00666.**

No. A-1-CA-36231

**APPEAL FROM THE DISTRICT COURT OF SAN MIGUEL COUNTY
Gerald E. Baca, District Judge**

Domenici Law Firm, P.C.
Pete V. Domenici, Jr.
Reed C. Easterwood
Albuquerque, NM

for Appellant

Rothstein Donatelli LLP
Richard W. Hughes
Caroline "KC" Manierre
Santa Fe, NM

for Appellee

### MEMORANDUM OPINION

**B. ZAMORA, Judge.**

**{1}** Shirley Kelley (Kelley) appeals the district court's order granting a motion to exclude 6.2 acres of land from the Estate of Encarnacion Rivera, Kelley's grandfather. Arguing judicial estoppel and the after-acquired title doctrine, Kelley asserts that the property became part of the Estate of Encarnacion Rivera, entitling her to an intestate share as an heir. Because the property at issue is not and never was a part of Encarnacion Rivera's estate, we affirm.

### BACKGROUND

**{2}**     This case involves a dispute over 6.2 acres of land (subject property) in Terrero, New Mexico, along the Pecos river. The property had been occupied by Cristino Rivera, Encarnacion's father, and his heirs for several generations beginning in the 1870s. The subject property is located within a larger area of land that was subsequently identified as "Lot 10." The United States continuously owned all of Lot 10 until 2009 when it conveyed a portion of it, composed of the subject property, to Ramona Lawson, Encarnacion's daughter, and Boyd Lawson, Ramona's husband.

**{3}**     The genesis of the controversy involves a mistake concerning the boundaries of a patent issued to Cristino Rivera in 1888, pursuant to the Homestead Act. Cristino believed, based on an 1883 survey, that the subject property was part of the 160 acres of land for which he sought a patent. A year after the 1883 survey, Cristino Rivera applied to the General Land Office, currently the Bureau of Land Management (collectively BLM), for a patent consisting of 160 acres of land and certified in a homestead proof that he had established residence, built a corral, fences, and cultivated the land for several years. The BLM issued the patent to Cristino Rivera in 1888 (1888 patent), evidencing a conveyance of what was thought at the time to be 160 acres based on the 1883 public land survey. In 1892, the area surrounding the property described in Cristino's 1888 patent was designated as part of the Pecos River Forest Reserve, now the Santa Fe National Forest, precluding further patents in the area.

**{4}**     In 1918, Cristino Rivera died without a will and the land described in the 1888 patent passed to his heirs. Amongst the heirs, it was decided that Encarnacion Rivera would receive the subject property, which also included a stone cellar, house, cabin, and the surrounding land. In 1925, the BLM independently resurveyed the land described in the 1888 patent to more accurately locate the boundaries of the property patented to Cristino Rivera. The 1925 survey identified the property owned by the Rivera estate as "Tract 43." However, based on the 1925 survey, the land described in Cristino Rivera's 1888 patent contained only approximately 148 acres. Further, the survey revealed that the structures Cristino Rivera had described as grounds to apply for the patent—including the stone cellar and cabin—were not part of the land described in the 1888 patent. Instead, the survey established that the area containing the improvements, identified as Lot 10, was still owned by the United States and was adjacent to Tract 43, the property actually owned by the Rivera estate pursuant to the 1888 patent. Consequently, the 1925 survey established that the 1888 patent did not describe the land Cristino Rivera had initially thought was being conveyed and that Cristino and Encarnacion had been living on land owned by the United States. Encarnacion wrote to the BLM in 1946 "indicating a desire to amend his father's homestead entry" and gain title to Lot 10, but never successfully obtained title. Likewise, although the Forest Service knew that Rivera's heirs were occupying the house on Lot 10, it never initiated any action to evict them.

**{5}**     Encarnacion Rivera died in 1966 and his wife, Ignacita Rivera, inherited his property through probate proceedings. The parties do not dispute that the probate did not include any land in Lot 10 and consequently, did not include the subject property,

because, when Encarnacion Rivera died in 1966, the United States continued to own Lot 10 where the structures were located.

{6}     Nevertheless, in 1979 Ignacita purported to convey via quitclaim deed approximately sixteen acres on Lot 10 to Ramona Lawson, her daughter, and Boyd Lawson, Ramona's husband. This conveyance presumably encompassed what would later be identified as the subject property. In 1986, Ramona and Boyd Lawson sought to confirm title to property later identified as the subject property through a color of title action, which was denied by the Interior Board of Land Appeals (IBLA). Nine years later, Ramona and Boyd Lawson filed an application with the BLM that sought to correct the 1888 patent to include 12 acres of Lot 10, which also would have included the subject property. In the application, Ramona and Boyd Lawson conceded that the United States owned Lot 10 and that it was "under the jurisdiction of the United States Forest Service," but argued that the land in Lot 10 upon which the structures sat was erroneously omitted from the 1888 patent. In 1997, the BLM denied Ramona and Boyd Lawsons' application to correct the patent, but, in 2003 the IBLA reversed the BLM's decision, concluding "that the equities clearly fall in favor of correcting the patent to include" the land originally sought by Cristino and thought to have been conveyed by the BLM. The IBLA remanded the case to the "BLM for further action in compliance with [its] decision." However, the record does not reflect that the BLM ever corrected the patent or conveyed to Ramona and Boyd Lawson the requested 12 acres, which, as we have noted, would have included the subject property.

{7}     The record does not reflect any factual development immediately following the IBLA's decision. In 2007, the Forest Service conducted another survey of Lot 10 and, for the first time, demarcated the 6.2 acres consisting of the subject property in dispute here. In 2009, Congress passed the Omnibus Public Land Management Act, authorizing the Forest Service to convey the subject property to Ramona and Boyd Lawson. Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, § 3304, 123 Stat. 1134, 123 (2009). The United States Forest Service quitclaimed the subject property to Ramona and Boyd Lawson the same year.

{8}     In 2016, Kelley, Encarnacion Rivera's granddaughter, filed a petition in the district court to reopen the 1967 probate of Encarnacion's estate, specifically seeking to probate the subject property. In response, Boyd Lawson and Sondra Lawson Bennett (collectively Lawsons) filed a motion to exclude the property from Encarnacion's estate and to close the probate proceedings, which the district court granted after finding that the subject property was not part of Encarnacion Rivera's estate.[1] The district court concluded that the conveyance of the subject property was a result of a settlement between Ramona and Boyd Lawson and the United States Forest Service. Kelley subsequently appealed.[2]

---

[1] By this point, Ramona Lawson had passed away.

[2] While this case was pending below, Boyd Lawson also passed away, leaving Sondra Lawson Bennett, Ramona and Boyd Lawson's daughter, as the only living appellee in this case.

**DISCUSSION**

**{9}**     On appeal, Kelley argues the district court erred because: (1) the Lawsons were judicially estopped from arguing that the subject property was not part of Encarnacion's estate; and (2) the doctrine of after-acquired title gave Kelley an intestate share of the subject property. For the reasons stated below, we do need to reach Kelley's third argument that the quitclaim by Ignacita Rivera to Ramona and Boyd Lawson in 1979 did not preclude Kelly from claiming an interest in the property. We address each argument in turn.

**I.      Judicial Estoppel**

**{10}**     Both parties request that we apply a de novo standard of review. However, generally, "[w]here a district court denies equitable relief, such as estoppel, we review the matter for abuse of discretion." *In Re Adoption Petition of Rebecca M.*, 2008-NMCA-038, ¶ 22, 143 N.M. 554, 178 P.3d 839; *see Laughlin v. Convenient Mgmt. Servs., Inc.*, 2013-NMCA-088, ¶ 15, 308 P.3d 992 ("We review the proper application of judicial estoppel under an abuse of discretion standard."). Irrespective of which standard of review we apply, Kelley's arguments fail.

**{11}**     "Judicial estoppel is a doctrine that prevents a party who has successfully assumed a certain position in judicial proceedings from then assuming an inconsistent position, especially if doing so prejudices a party who had acquiesced in the former position." *Santa Fe Pac. Tr., Inc. v. City of Albuquerque*, 2012-NMSC-028, ¶ 32, 285 P.3d 595 (internal quotation marks and citation omitted). "The purpose of judicial estoppel is to prevent a party from playing fast and loose with the court during the course of litigation." *Laughlin*, 2013-NMCA-088, ¶ 16 (internal quotation marks and citation omitted). To prevail under the doctrine of judicial estoppel:

> First, the party against whom the doctrine is to be used must have successfully assumed a position during the course of litigation. Second, that first position must be necessarily inconsistent with the position the party takes later in the proceedings. Finally, while not an absolute requirement, judicial estoppel will be especially applicable when the party's change of position prejudices a party who had acquiesced in the former position.

*Santa Fe Pac. Tr., Inc.*, 2012-NMSC-028, ¶ 32 (internal quotation marks and citation omitted).

**{12}**     For a number of reasons, judicial estoppel does not apply under the facts and circumstances of this case.[3] We begin by analyzing whether Ramona and Boyd Lawson

---

3Ramona and Boyd Lawson challenge whether the doctrine of judicial estoppel can be applied in multiple proceedings. Historically, New Mexico cases applied the doctrine of judicial estoppel in cases involving a single legal proceeding. However, more recent cases suggest that the doctrine has been applied to inconsistent positions taken in separate proceedings. No New Mexico opinion has discussed the exact boundaries of the doctrine or the

successfully assumed a position during the course of litigation before the IBLA—the first factor of judicial estoppel. Kelley argues Ramona and Boyd Lawson were successful before the IBLA based on their position that "the 1888 patent and 1883 survey, upon which the parties relied, showed that Cristino Rivera intended the homestead to include Lot 10." As more fully explained below, we disagree that Ramona and Boyd Lawson were successful in their litigation before the IBLA. Because we conclude the first factor required for judicial estoppel has not been established, we need not address the remaining factors.

{13}    The Secretary of the United States Department of the Interior, which both the BLM and IBLA are a part of, has the authority to correct patents, but any corrections "which affect the boundaries of, or jurisdiction over, land administered by another Federal agency shall be made only after consultation with, and the approval of, the head of such other agency." 43 U.S.C. § 1746 (2018). At the time IBLA made its decision, Lot 10, which included the subject property, was owned by the United States Forest Service, an agency within the Department of Agriculture, not the Department of Interior. As such, the Department of Interior could not have corrected the 1888 patent until the Department of Agriculture was consulted and gave approval. Despite the IBLA's conclusion "that the equities clearly fall in favor of correcting the patent" and its decision to remand the case "to BLM for further action in compliance with [its] decision[,]" the IBLA did not and could not correct the 1888 patent without action by the Forest Service. We conclude that the absence of the Forest Service's approval to correct the 1888 patent, pursuant to § 1746 is dispositive.

{14}    Kelley argues that the Forest Service's quitclaim deed of the property to Ramona and Boyd Lawson was a result of the IBLA decision and that the Department of Interior consulted with the Forest Service, who approved correction of the 1888 patent by authorizing the quitclaim deed. Upon examination of the record, we fail to see how this could be the case. The record reflects that Ramona and Boyd Lawson obtained the quitclaim deed to the subject property based on a settlement with the Forest Service and not, as Kelley argues, through Ramona's position as an heir to Cristino Rivera. The quitclaim deed reflects a conveyance of 6.2 acres (subject property), not the 12 acres requested in the application to the IBLA, the deed indicates that it is from the United States of America to Ramona and Boyd Lawson, states that it is subject to an easement, references an attached release, and is signed by an official with the Forest Service.

{15}    The release acknowledges that, through the IBLA decision, Ramona and Boyd Lawson had "proven their entitlement" to the lands sought to be corrected by their

scope of its application. *See Guzman v. Laguna Dev. Corp.*, 2009-NMCA-116, ¶¶ 11-13, 147 N.M. 244, 219 P.3d 12 (applying judicial estoppel when a party took a position in its case before the Workers' Compensation Administration that was inconsistent with the position it later took in the district court); *see also Gallegos v. Pueblo of Tesuque*, 2002-NMSC-012, ¶ 23, 132 N.M. 207, 46 P.3d 668 (analyzing a judicial estoppel claim when a party's position taken in prior federal cases was inconsistent with its position in state court, but nonetheless concluding that the doctrine was inapplicable because it "cannot be used against a party which espoused a position in an earlier case and lost and is now correctly stating the law that came from that decision").

application, but the Forest Service "disputed the legal entitlement of [Ramona and Boyd] Lawson[] to the lands and improvements, and the Forest Service is required to consent to the issuance of a corrected patent[.]" The release then states that Ramona and Boyd Lawson and the Forest Service agreed to settle issues over the entitlement to the subject property. In exchange for the conveyance of the subject property, which included a conservation easement, Ramona and Boyd Lawson released their claims against the United States. The release also references the Omnibus Public Land Management Act of 2009. This Act indicates that the Department of Agriculture would transfer the subject property to Ramona and Boyd Lawson in exchange for a release of any other claims to Lot 10 and the granting of a scenic easement in the subject property. Omnibus Public Land Management Act of 2009, Pub. L. No. 111-11, § 3304, 123 Stat. 1134, 123.

**{16}** Neither the quitclaim deed, release, nor the Omnibus Public Land Management Act of 2009 shows that the Department of the Interior corrected the 1888 patent or that the Forest Service consented to a correction. *See* 63C Am. Jur. 2d *Public Lands* § 70 (2019) ("The Secretary of the Interior may correct errors in patents or documents of conveyance relating to the disposal of public lands. Any corrections which affect the boundaries of, or jurisdiction over, land administered by another Federal agency, however, will be made only after consultation with, and the approval of, the head of that agency." (footnotes omitted)). To the contrary, the record reflects that the Forest Service did not approve of the transfer of the subject property based on the IBLA decision, but rather transferred the subject property to settle a dispute with Ramona and Boyd Lawson. Ramona and Boyd Lawson did not succeed before the IBLA because the IBLA decision did not directly result in conveyance of the requested 12 acres or even the subject property and they eventually acquired the subject property through settlement. *See Sw. Steel Coil, Inc. v. Redwood Fire & Cas. Ins. Co.*, 2006-NMCA-151, ¶ 19, 140 N.M. 720, 148 P.3d 806 (holding that a party was not successful in assuming a position when the parties settled before the lower court resolved the issue). Accordingly, judicial estoppel does not apply.

**{17}** In the context of her judicial estoppel argument, Kelley also argues that the IBLA decision constituted the law of the case and its legal effect related back to the time when the United States originally granted Cristino Rivera the 1888 patent. The doctrine of law of the case applies "to litigation of the same issue recurring within the same suit." *Alba v. Hayden*, 2010-NMCA-037, ¶ 7, 148 N.M. 465, 237 P.3d 767. Under this discretionary doctrine, "decision by an appeals court on an issue of law made in one stage of a lawsuit becomes binding on subsequent trial courts as well as subsequent appeals courts *during the course of that litigation.*" *State ex rel. King v. UU Bar Ranch Ltd. P'ship*, 2009-NMSC-010, ¶ 21, 145 N.M. 769, 205 P.3d 816 (emphasis added). The doctrine does not apply here because the IBLA decision stemmed from a separate proceeding. Thus, any legal issues decided before the IBLA are inapposite here and do not constitute law of the case. Additionally, to the extent these are distinct arguments, they are disjointed, undeveloped, and Kelley fails to identify where she preserved them. *See State v. Leon*, 2013-NMCA-011, ¶ 33, 292 P.3d 493 ("We generally do not consider issues on appeal that are not preserved below." (internal quotation marks and citation

omitted)); *see also Corona v. Corona*, 2014-NMCA-071, ¶ 28, 329 P.3d 701 ("This Court has no duty to review an argument that is not adequately developed.").

## II.    After-Acquired Title and the 1979 Conveyance

**{18}**    Kelley also argues that the district court should have applied "a species of after-acquired title doctrine to the matter to preserve [Kelley's] equitable right in" the subject property. Kelley contends that the United States, the original grantor, intended to patent the subject property to Cristino Rivera in 1888 and that is the reason the Forest Service quitclaimed the subject property to Ramona and Boyd Lawson. Thus, according to Kelley, the subject property passed from Cristino Rivera into the Estate of Encarnacion Rivera.

**{19}**    "The common law doctrine of after-acquired title is one under which title to land subsequently acquired by a grantor who previously attempted to convey title to the same land, which he then did not own, completely and automatically inures to the benefit of his prior grantee." *Hays v. King*, 1989-NMSC-078, ¶ 8, 109 N.M. 202, 784 P.2d 21. "The doctrine is nothing more than an enforcement of the grantor's obligation to deliver a good title." *Id.* (internal quotation marks and citation omitted). The after-acquired title doctrine has been "applied to vest title in the first grantee and those holding under him where there were two chains of title from one initial grantor." *Rendleman v. Heinley*, 2007-NMCA-009, ¶ 19, 140 N.M. 912, 149 P.3d 1009. This Court has expressed doubts about the applicability of the after-acquired title doctrine when title is conveyed via quitclaim deed, as it was here. *See Rabo Agrifinance, Inc. v. Terra XXI, Ltd.*, 2014-NMCA-106, ¶ 8, 336 P.3d 972 ("[Defendant] likens this language to a quitclaim deed, to which the after-acquired title doctrine is likely inapplicable."). The applicability of the after-acquired title doctrine is a question of law, which we review de novo. *Id.* ¶ 7.

**{20}**    Even if the doctrine did apply in situations where title is conveyed by quitclaim deed, it would not be relevant here. The United States never conveyed the subject property to Cristino Rivera and, as we have pointed out, always owned Lot 10 until it conveyed a portion of it to Ramona and Boyd Lawson in 2009. As the district court noted, there are several instances in the record that illustrate this fact. First, the 1925 survey showed that the 1888 patent did not include the subject property. Second, the IBLA denied a color of title application submitted by Ramona and Boyd Lawson in 1986, which sought to confirm their title in the subject property. Lastly, the United States did not subsequently obtain title to the subject property. Instead, the United States always had title to it. The record reflects a single chain of title from the United States Forest Service to Ramona and Boyd Lawson, making the doctrine inapplicable.

**{21}**    Lastly, Kelley argues that Ignacita Rivera's 1979 conveyance to Ramona and Boyd Lawson did not preclude Kelly from her claim to the property. As our previous analysis has shown, the subject property never entered the Estate of Encarnacion Rivera and thus Ignacita did not own the land the conveyance described at that time or at any other time. *See Metzger v. Ellis*, 1959-NMSC-031, ¶ 14, 65 N.M. 347, 337 P.2d

609 ("[A] quitclaim deed conveys nothing if the grantor himself did not have title or an interest in the property.").

**CONCLUSION**

**{22}** For the aforementioned reasons, we affirm.

**{23}  IT IS SO ORDERED.**

**BRIANA H. ZAMORA, Judge**

**WE CONCUR:**

**M. MONICA ZAMORA, Chief Judge**

**MEGAN P. DUFFY, Judge**